STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-15-048

EASTERN MAINE ELECTRIC
COOPERATIVE, INC.,

    Plaintiff,

v.

FIRST WIND HOLDINGS, LLC, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

**COMBINED ORDER ON PARTIES'
POST-TRIAL MOTIONS**

Before the Court are the following post-trial motions: (1) Defendants First Wind Holdings, LLC ("First Wind"), Evergreen Gen Lead, LLC, Evergreen Wind Power III, LLC, Stetson Holdings, LLC, and Stetson Wind II, LLC's (collectively "Defendants") renewed motion for judgment as a matter of law, or, in the alternative, motion for a new trial or remittitur; (2) Plaintiff Eastern Maine Electric Cooperative, Inc.'s ("EMEC") motion for immediate execution or alternatively, an order that Defendants give a bond pending appeal; and (3) EMEC's bill of costs.

On December 23, 2011, EMEC, First Wind, on behalf of itself and any subsidiaries in involved in the transaction, and Bangor Hydro Electric Company ("Bangor Hydro" or "BHE") and its parent company Emera, Inc. ("Emera") entered into a Precedent Transmission Line Agreement (the "Precedent Agreement"). The Precedent Agreement incorporated a Term Sheet, which set forth certain terms for the sale of a transmission line known as the "Stetson Line" to EMEC and Bangor Hydro. The parties agree that the Precedent Agreement required them to negotiate in good faith to come a definitive agreement regarding the sale of the Stetson Line. The parties were ultimately unable to reach a definitive agreement. EMEC filed a complaint

with the Superior Court on October 24, 2014. This action was then transferred to the Business and Consumer Docket. On November 18, 2016, a Penobscot County jury returned a verdict awarding damages to EMEC in the amount of $13,604,400.00 in lost profits. On November 21, 2016, the court entered judgment against Defendants.

Oral argument on all pending motions was held on January 31, 2017. The court considered the parties' written submission, the last of which was received on March 10, 2017. It has also reviewed its notes from trial as well as certain transcripts of witness testimony. For the reasons stated below, the court denies Defendants' renewed motion for judgment as a matter of law, Defendants' motion for a new trial or remittitur, and EMEC's motion for immediate execution or that Defendants give a bond pending appeal. The court defers consideration of EMEC's bill of costs pending the expiration of the appeal period or the conclusion on any appeal to the Law Court.

## I.     DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.     Standard of Review

Pursuant to Maine Rule of Civil Procedure 50(a), the court may grant a motion for judgment as a matter of law if "viewing the evidence and all reasonable inferences therefrom most favorably to the party opposing the motion, a jury could not reasonably find for that party on an issue that under the substantive law is an essential element of the claim." M.R. Civ. P. 50(a). A party seeking judgment as a matter of law pursuant to Rule 50(b) following a trial must establish that "the adverse jury verdict was 'clearly and manifestly wrong.'" *Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 5, 724 A.2d 1248 (citation omitted); M.R. Civ. P. 50(b). The court shall grant a motion for judgment as a matter of law following a trial "only if the jury was 'rationally compelled' to conclude that the moving party is

2

entitled to judgment in its favor, and should deny the motion if 'based on all the evidence, reasonable minds could reach different conclusions on dispositive questions of fact.'" *Tobin v. Barter*, 2014 ME 51, ¶ 8, 89 A.3d 1088 (citation omitted). In other words, a motion for judgment as a matter of law will not be granted "if any reasonable view of the evidence could sustain a verdict for the opposing party." *Id.* (internal quotation and citation omitted).

To prevail on a breach of contract claim, a plaintiff must establish: (1) the parties had a legally binding contract; (2) the defendant breached a material term of the contract; and (3) defendant's breach caused the plaintiff to suffer damages. *Id.* ¶¶ 9-10. Whether a party has breached a material term of a contract and causation are questions of fact for the jury. *Me. Energy Recovery Co.*, 1999 ME 31, ¶ 7, 724 A.2d 1248.

An agreement to negotiate in good faith toward the formation of another contract can itself be an enforceable contract so long as the agreement to negotiate in good faith otherwise meets the requirements to form a binding contract. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 277 (7th Cir. 1996). "Good faith" requires both honesty in fact and that the party observes reasonable commercial standards of fair dealing. *Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 14, 719 A.2d 111. In order to obtain an award of damages for the benefit of the bargain, the plaintiff must prove that one or more defendants acted in bad faith; that but for the bad faith, the parties would have reached a final agreement; that the loss of the final agreement was a foreseeable result of the bad faith; and the damages must be proven to a reasonable degree of certainty. *Venture Assocs. Corp.*, 96 F.3d at 278; Restatement (Second) of Contracts §§ 347, 351-52.

3

B.    Analysis

Defendants assert they are entitled to judgment as a matter of law on five grounds: (1) there was insufficient evidence that Defendants failed to negotiate in good faith; (2) there was no evidence that parties could have obtained lender consent; (3) there was insufficient evidence of mutual assent to the terms of the Term Sheet; (4) the Precedent Agreement provided the sole remedy in the event a definitive agreement was not reached and lost profits were not reasonably foreseeable; and (5) there was insufficient evidence to find the Subsidiary Defendants liable. (Defs. Mot. 3-15.) The court addresses each issue in turn.

### 1.    *Obligation to Negotiate in Good Faith*

Defendants assert that no reasonable jury could find that Defendants breached their obligation to negotiate in good faith toward a definitive transmission line agreement to sell the Stetson Line. (*Id.* at 3-5.) Defendants assert that "the trial record was completely devoid of any evidence of dishonesty, improper tactics or deliberate misconduct" that would rise to the level of bad faith. (*Id.* at 5.) Defendants assert, rather, there was substantial evidence that First Wind worked diligently in negotiating towards a definitive agreement. (*Id* at 5-6.) Defendants also argue that the Precedent Agreement required that all "reasonable and customary terms" would be included in the final agreement and that the evidence at trial showed that insurance was a "reasonable and customary term." (*Id.* at 6.) In response, EMEC asserts that the jury could have found that Defendants failed to meet their obligation to negotiate in good faith in at least two ways: (1) Defendants demanded that EMEC obtain property insurance for the Stetson Line, an impossible task because such insurance does not exist; and (2) Defendants' demand that EMEC obtain insurance was not a part of the Precedent Agreement and was not a "reasonable and customary term." (Pl. Opp'n to Defs. Mot. 4-6.) In their supplemental brief, Defendants assert

4

that First Wind was not insisting on an impossible task, but rather, in good faith, seeking to deal with the issue of catastrophic loss. (Defs. Suppl. Br. 12-13.)

In support of their assertion, Defendants cite trial testimony from First Wind executive Adam Horwitz, EMEC chief executive Scott Hallowell, Emera executive Gerard Chasse, and exhibits tending to demonstrate that the Precedent Agreement and Term Sheet provided that "reasonable and customary terms" and "conditions on necessary consents" would be included in the definitive agreement; that First Wind was not "demanding" EMEC obtain insurance; that First Wind was trying to solve the problem of catastrophic loss; that the parties were working to find a solution that would keep the wind farms in no worse of a position after the transaction closed; that the parties did not know obtaining insurance would be problematic; that First Wind did not learn that insurance was not available for a transmission line until the summer of 2013; that First Wind contacted its own insurance broker to check if there was some other way to insure the Stetson Line; that First Wind's lenders would not have consented to the sale without insurance or some other protection in place; and that First Wind did not contact its lenders about obtaining consent without insurance because lenders generally prefer that a deal be finalized before seeking consents. (Jt. Exs. 45, 79, 107; Pl. Exs. 20, 24-25; Horwitz Tr. 43:15-44:1, 41:24-43:5, 125:13-22, 134:15-20, 135:2-9; Hallowell Tr. 136:13-22; Chasse Dep. 72:12-15, 18-21.)

However, the jury also received evidence demonstrating that First Wind was involved in the drafting of the Term Sheet and that obtaining insurance coverage for the transmission line was not an express term of the Precedent Agreement or Term Sheet. (Jt. Exs. 35, 44-45.) The jury heard testimony from Chasse that insurance was the "major issue" preventing a final agreement and that other issues were "mostly mechanical" and likely could have been worked out. (Chasse Dep. 129:5-130:2.)

5

The jury heard testimony from Hallowell and received exhibits demonstrating that obtaining insurance for the transmission line "was never anyone's plan"; that insurance was not a part of the Precedent Agreement or Term Sheet; that Defendants demanded many times that EMEC obtain insurance; that it was "impossible" for EMEC to obtain insurance for the transmission line; that Hallowell was perplexed by Defendants' demand; that even after EMEC told Defendants they could not obtain insurance, Defendants continued to demand EMEC obtain insurance; and that insurance was the only issue holding up completion of the deal. (Hallowell Tr. 93:9-96:4; Jt. Ex. 122.)

The jury also heard expert testimony from commercial banker Aivars Udris that lenders would not require a transmission company to obtain insurance to replace a transmission line; that he has never seen a lender impose such a requirement on a transmission line from a transmission-only company; that there is generally no insurance on transmission lines that belong to a transmission or distribution only company; and that it would not be "reasonable and customary" to insure a transmission line. (Udris Tr. 17:5-18:9, 22:19-22.) EMEC's expert William McDevitt, a retired employee of the federal Rural Utilities Service, also testified there is no insurance on transmission lines. (McDevitt Tr. 12:4-8.)

The jury further heard testimony from Horwitz conceding that he never contacted First Wind's lenders about whether it would consent to the sale of the Stetson Line without insurance and that he had no knowledge of anyone else at First Wind contacting its lenders about the sale or the insurance requirement. (Horwitz Tr. 99:7-10, 99:20-100:2, 125:13-126:2, 138:21-139:1.)

Additionally, the jury heard testimony and received evidence regarding an August 13, 2013 insurance report sent to First Wind that stated, "Outside of the wind industry, physical damage to transmission lines (beyond 1,000 feet) is typically self-insured to a large extent

6

considering that the expected per event losses are usually under the policy deductibles and repairs can be made rapidly." (Jt. Ex. 106; Horwitz Tr. 114:14-118:18.) Horwitz conceded that "self-insured" meant a transmission line is typically not insured through a third-party insurance product. (Horwitz Tr. 118:7-8.)

Lastly, the jury also received a December 15, 2011 email exchange between Horwitz and other executives at First Wind in which Horwitz describes the transaction as a "killer deal" for EMEC and a $1,000,000 hit in value for First Wind, which would put First Wind in a worse position that its deal with Emera. (Jt. Ex. 40.) The jury also received a November 20, 2013 email exchange between Horwitz and another First Wind employee, Pete Keel, regarding the Stetson Line negotiations with EMEC. (Jt. Ex. 119.) In the email, Keel wrote, "...thinking of our conversation this morning. Not to negotiate, but deal with follow up, etc." (Id.)

Viewing the evidence and all reasonable inferences in the light most favorable to EMEC as the prevailing party, the jury could reasonably find that Defendants failed to act honestly and observe reasonable commercial standards of fair dealing in its negotiations with EMEC by continuing to insist that EMEC complete an impossible task of obtaining insurance on the transmission line and by insisting on a term that was not a part of the Precedent Agreement or the Term Sheet and was not a "reasonable and customary" term. Based on the evidence, the jury was not rationally compelled to accept Defendants' argument that First Wind worked diligently in negotiating towards a definitive agreement.

### 2. Lender Consent

Defendants assert that lender consent was required in order to sell the Stetson Line and that, without lender consent, the transaction would not have been completed. (Defs. Mot. 9.) Defendants assert that EMEC failed to produce any evidence that, without insurance or some

7

other mechanism, lender consent still could have been obtained. (Defs. Mot. 9; Defs. Suppl. Br. 2.) Thus, according to Defendants, EMEC failed to prove that, but for Defendants' bad faith, the parties would have reached a definitive agreement in order to obtain lost profits damages. (*Id.*)

In support of their assertion, Defendants cite trial testimony from Horwitz and Hallowell and exhibits demonstrating that Defendants' lenders required Defendants to maintain insurance on its assets; that Defendants did maintain such insurance; that Defendants were required to obtain consent from their lenders before selling the transmission line; that lender consent was a known issue that was brought to the parties' attention; that EMEC knew that lender consent was a requirement; that First Wind added terms regarding lender consent to the Term Sheet; that obtaining lender consent to the transaction was an express requirement of the Term Sheet; and that lender consent was a "critical path item" in the negotiation. (Defs. Exs. 10, 24; Jt. Exs. 44-45, 68; Horwitz Tr. 11:20-12:7, 12:17-14:19, 16:7-22, 17:10-24, 19:3-16; Hallowell Tr. 98:22-99:6.)

Horwitz also testified that lenders "are most concerned about the security of their investment"; that the lenders would not want to be in a worse position regarding their risk profile after the transaction; and that Defendants' lenders would not consent to a deal where there was no insurance or protection in place. (Horwitz Tr. 25:20-26:17, 125:13-22.) Defendants also cite testimony from EMEC's expert Udris conceding that a lender's investment in a wind farm is primarily protected by the revenue stream from the generation of power by the wind farm, that the transmission line is critical to that investment, and that a lender would not consent to a transaction "without some change in the risk profile or circumstances." (Udris Tr. 21:8-14, 21:22-22:5.)

8

However, as previously discussed, the jury heard testimony from Chasse that insurance was the "major issue" preventing a final agreement and that other issues were "mostly mechanical" and likely could have been worked out. (Chasse Dep. 129:5-130:2.) The jury also heard testimony from Hallowell that, prior to signing the Precedent Agreement, Defendants never indicated to EMEC that there were any problems with their lenders or that their lenders would require anything different than what was in the Term Sheet; that the only major issue holding up completion of the transaction was the insurance issue; and that due to the demand for insurance the transaction was not going to occur. (Hallowell Tr. 94:23-95:1, 140:9-13, 145:9-15.) The jury heard testimony in which Horwitz conceded that insurance was "the key issue" holding up the transaction. (Horwitz Tr. 119:9-12, 124:10-14.) The jury also received a November 2013 email from Horwitz to Pete Keel stating, "EMEC coverage/security is the key deal point that needs to get solved." (Jt. Ex. 118.)

The jury also heard testimony form EMEC's expert Udris that a bank would not require a transmission-only company to insurance a transmission line; that there is generally no insurance on a transmission line that is not a part of a generation facility; that the fact that the line could not be insured against property damage was not an issue for a prospective lender; and that losses from damage to transmission lines can be recovered through Federal Emergency Management Agency ("FEMA") or Rural Utilities Service ("RUS") funds or grants. (Udris Tr. 17:5-18:6, 19:14-24, 22:19-25.) As previously discussed, the jury heard testimony regarding the August 13, 2013 insurance report to First Wind stating that transmission lines beyond 1,000 feet are typically self-insured and do not present a substantial risk. (Jt. Ex. 106; Horwitz Tr. 114:14-118:24.)

9

Although Udris conceded on cross-examination that a lender would not consent to a transaction "without some change in the risk profile or circumstances", Udris testified there were ways to solve the issue of risk other than insurance. (Udris Tr. 21:22-22:15.) Udris further testified that a purchaser of a transmission line could simply agree to cover the cost of any damage or look to the availability of FEMA or RUS funds or commercial loans to cover any damages. (*Id.* at 22:10-13, 24:10-25.) McDevitt also testified there is no insurance on transmission lines and the cost of repairing damage may be reimbursed through FEMA assistance, RUS loan financing, or passed on to the ratepayers. (McDevitt Tr. 12:4-14, 14:16-22.)

Additionally, the jury heard testimony from Horwitz conceding that insurance was not the only way to deal with the risk of catastrophic loss; that Bangor Hydro was able to find a non-insurance solution acceptable to Defendants; and that the parties were working towards a solution that kept the wind farms in no worse of a position after the transaction closed and that insurance "or an alternate" was part of that effort. (Horwitz Tr. 43:23-44:11; 134:15-20.) The jury also heard testimony from Horwitz and received evidence that Defendants' lenders required them to maintain property insurance "subject to commercial availability." (*Id.* at 96:21-97:6; Defs. Ex. 10.) Horwitz conceded that insurance that does not exist is not commercially available. (*Id.* at 97:7-10.) Horwitz also conceded he never contacted First Wind's lenders about the sale of the Stetson Line; that he was not a member of finance team that dealt with the company's lenders; that he had no knowledge of anyone else at First Wind communicating with their lenders about the Stetson Line transaction; and that he had no knowledge of any communications with any lenders regarding insurance on the Stetson Line. (*Id.* at 99:7-100:2, 125:23-126:1, 138:21-139:1.)

10

Viewing the evidence and all reasonable inferences in the light most favorable to EMEC as the prevailing party, the jury could reasonably find that but for Defendants' demand that EMEC obtain insurance, the parties would have reached a definitive agreement. Although the jury heard testimony from Horwitz that Defendants' lenders would not consent to a deal where there was no insurance or protection in place, the jury also heard evidence that Defendants' lenders required them to maintain property insurance "subject to commercial availability", and that neither Horwitz nor anyone else at First Wind contacted Defendants' lenders or inquired about insurance on the Stetson Line. It is the jury's role to weigh evidence and assess credibility. *Garland v. Roy*, 2009 ME 86, ¶ 22, 976 A.2d 940 (citation omitted). Thus, the jury was free to disregard Horwitz's testimony that Defendants' lenders would not consent to a deal without insurance in place. There was sufficient evidence for the jury to reasonably find that insurance was the only major issue holding up completion of the transaction; that all other issues were "mostly mechanical"; that insurance was not available for a transmission line; that there were ways to solve the issue of risk of catastrophic loss other than insurance; that transmission lines without insurance do not present a substantial risk; and that the lack of insurance on a transmission line was generally not an issue for lenders; that Defendants' lenders would have consented to the transaction; and that but for Defendants' demand that EMEC obtain insurance, the parties would have reached a definitive agreement.

### 3. *Evidence of Mutual Assent to the Term Sheet*

Defendants assert there was insufficient evidence of mutual assent to the Term Sheet presented at trial. (Defs. Mot. 11.) Rather, according to Defendants, the evidence demonstrated that there was no meeting of the minds among EMEC, Bangor Hydro, and First Wind concerning the responsibility for costs of the Stetson Line under the Term Sheet. (*Id.*)

11

At trial, the court instructed the jury that the parties agreed that there was a contract to negotiate in good faith to come to a definitive agreement. The Precedent Agreement was included in evidence. (Jt. Ex. 45.) The jury was further instructed that it was their duty to decide, based on that agreement and all the other evidence presented at trial, whether EMEC had proven by a preponderance of evidence that the Defendants breached their obligation to negotiate in good faith, and if they did, whether the breach caused economic damages to EMEC. *See Venture Assocs. Corp.*, 96 F.3d at 277-78. Pursuant to the verdict form, the jury found that EMEC proved that it was more likely than not that Defendants had failed to negotiate in good faith. As discussed above, the jury's finding was supported by evidence presented at trial and the jury was not rationally compelled by the evidence to find otherwise. Thus, the jury was not required to find mutual assent to all the terms of the Term Sheet in order to award the damages they did award to EMEC.

      4.     *The Remedy in the Event a Definitive Agreement was not Reached and the Foreseeability of Lost Profits*

Defendants assert that ¶ 2 of the Precedent Agreement, permitting EMEC to draw on a $1,750,000.00 letter of credit issued by Bangor Hydro, provided the sole remedy to EMEC if the transaction did not occur. (Defs. Mot. 13; Defs. Suppl. Br. 11.) Defendants argue that, because EMEC drew on the letter of credit and received $1,750,000.00, EMEC has been made whole and not entitled to any additional remedies. (Defs. Mot. 13-14; Defs. Suppl. Br. 11-12.) Defendants also assert that there was insufficient evidence that the $13,604,400.00 in lost profits were reasonably foreseeable. (Defs. Mot. 14; Defs. Suppl. Br. 12.) Defendants contend that based on the Precedent Agreement the $1,750,000.00 letter of credit was the only amount reasonably

12

foreseeable.[1] (*Id.*) Defendants assert that lost profits based on the tariff payments to EMEC over the span of forty-five years was not reasonably foreseeable. (Defs. Mot. 14.)

The Precedent Agreement entered into by First Wind, EMEC, and Bangor Hydro and Emera and the attached Term Sheet were submitted to the jury. (Jt. Ex. 45.) Paragraph 1 of the Precedent Agreement provided, "**The Parties** shall proceed in good faith to negotiate, draft, execute and deliver … a definite binding agreement, …" (*Id.*) (emphasis supplied). Paragraph 2 of the Precedent Agreement provided, "Immediately upon execution of this Agreement, **BHE** will issue an Irrevocable Standby Letter of Credit in the amount of $1.75 million for the benefit of EMEC…" and that in the event that, at the time of the transfer of the Stetson line, a definitive agreement had not yet been reached, EMEC may draw on the letter of credit. (*Id.*) (emphasis supplied). EMEC ultimately drew on letter of credit and received the $1,750,000.00. (Hallowell Tr. 96:5-8.) Emera executive Chasse and Horwitz both testified that the $1,750,000.00 was EMEC's sole remedy for the transaction not closing. (Chasse Dep. 172:7-15; Horwitz Tr. 48:7-21.) Defendants argued to the jury that, under ¶ 2 of the Precedent Agreement, the letter of credit was EMEC's sole remedy under the Precedent Agreement if a definitive agreement was not reached and that the $1,750,000.00 was the only foreseeable damages. The jury, however, awarded $13,604,400.00 in lost profits to EMEC.

---

[1] Defendants also suggest that the most EMEC would be entitled to is an additional $1,000,000.00 on top of the $1,750,000.00 letter of credit under the Term Sheet. (Defs. Mot. 13-14.) The Term Sheet provided that if the transfer of a portion of the Stetson Line to EMEC did not take place within one year from the date of the definitive agreement "due solely to the actions or inactions of First Wind, Bangor Hydro, Emera, or any of the their affiliates" EMEC would consent to the transfer of the Stetson Line to Bangor Hydro, and "$1.75 million will be paid to EMEC under the terms of the of the letter of credit and Bangor Hydro shall pay to EMEC an additional $1 million; …" (Jt. Ex. 45.) For the same reasons discussed *infra*, the jury could reasonably find that this provision set forth an obligation between Bangor Hydro and EMEC and did not limit EMEC's ability to pursue damages from Defendants for breach of any agreement between EMEC and Defendants.

13

Viewing the Precedent Agreement in the light most favorable to EMEC as the prevailing party, the jury could have reasonably concluded that ¶ 1 of the Precedent Agreement set forth an obligation by all the parties, including Defendants, to proceed in good faith. The jury could have concluded ¶ 2 of the Precedent Agreement, on the other hand, set forth a separate obligation between Bangor Hydro and EMEC that did not include Defendants. Thus, the jury could have reasonably concluded that ¶ 2 of the Precedent Agreement was not a limitation on EMEC's ability to seek damages from Defendants for their breach of ¶ 1 of the Precedent Agreement. The jury was not required to believe Chasse's or Horwitz's testimony that the letter of credit was EMEC's sole remedy. *See Garland*, 2009 ME 86, ¶ 22, 976 A.2d 940.

Moreover, as discussed below, the jury could reasonably find that lost profits were reasonably foreseeable. The Precedent Agreement and attached Term Sheet were submitted to the jury. (Jt. Ex. 45.) Appendix I to the Term Sheet set forth the annual transmission revenue to be paid each year to EMEC over the span of forty-five years. (*Id.*) EMEC's expert Robert Strong testified, based on those revenues, that EMEC's lost profits when reduced to present value were $13,604,400.00. That testimony was not controverted by Defendants. Because the Precedent Agreement and attached Term Sheet set forth the amount of revenue to be paid to EMEC each year, the jury could reasonably find that EMEC's lost profits were reasonably foreseeable to the parties at the time the Precedent Agreement was made. Furthermore, based on Strong's testimony, the jury could also reasonably find that EMEC had proven its damages to a reasonable certainty.

### 5. *The Liability of the Subsidiary Defendants*

Defendants assert EMEC presented no evidence specific to the Subsidiary Defendants Evergreen Gen Lead, LLC, Evergreen Wind Power III, LLC, Stetson Holdings, LLC, or Stetson

14

Wind II, LLC. (Defs. Mot. 15.) Defendants assert that all of the evidence presented by EMEC was based on conduct by the parent company First Wind only. (*Id.*) Thus, according to Defendants, no reasonable jury could find the Subsidiary Defendants liable for breach of the agreement to negotiate in good faith. (*Id.*)

The Precedent Agreement, submitted to the jury, expressly states that the agreement was entered into by "First Wind Holdings, LLC on behalf of itself and any of its subsidiaries involved in the transactions related to the Term Sheet." (Jt. Ex. 45). The parties stipulated that the "subsidiaries involved in the transactions related to the Term Sheet" as used in the Precedent Agreement were the four Subsidiary Defendants: Evergreen Gen Lead, LLC, Evergreen Wind Power III, LLC, Stetson Holdings, LLC, or Stetson Wind II, LLC. (Jt. Ex. 157 ¶ 1.)

The jury also heard testimony from Horwitz that Paul Gaynor and Michael Alvarez were executive officers of both the parent company First Wind and the subsidiary entities that controlled the wind farms. (Horwitz Tr. 64:13-65:15.) Hallowell testified that First Wind "controlled" the subsidiaries, that the subsidiaries had no employees, and that "the employees were the holding company." (Hallowell Tr. 119:12-25.) Hallowell also testified that Kurt Adams, another First Wind executive involved in the transaction, never indicated that he lacked authority to negotiate for the wind farms and that Horwitz was acting on behalf of the "First Wind entities" during negotiations. (*Id.* at 49:19-50:8, 90:7-11.)

Viewing the evidence and all reasonable inferences in the light most favorable to EMEC as the prevailing party, the jury could reasonably find that First Wind was acting on behalf of its subsidiaries, that all of the Defendants were bound by the Precedent Agreement to negotiate in good faith towards a definitive agreement, and that First Wind was acting on behalf of all

15

Defendants during negotiations. Thus, the jury could reasonably find that all Defendants were liable for breach of the agreement to negotiate in good faith.

### C. Conclusion

Based on the foregoing, Defendants have failed to demonstrate that the jury could not reasonably find for EMEC on any issue that is an essential element of their claim. Accordingly, Defendants are not entitled to judgment as a matter of law in their favor.

## II. DEFENDANTS' MOTION FOR NEW TRIAL OR REMITTITUR

### A. Standard of Review

The court may grant a motion for a new trial to any or all parties and for all or any part of the issues in a case for any of the reasons for which new trials have heretofore been granted in actions in law or equity. M.R. Civ. P. 59(a). The court may grant a new trial following a jury verdict if the verdict was based on an erroneous jury instruction. *See Semian v. Ledgemere Transp., Inc.*, 2014 ME 141, ¶ 21, 106 A.3d 405; *Pettengill v. Turo*, 159 Me. 350, 193 A.2d 367 (1963). The court may also grant a new trial if the jury's award of damages is excessive. *Seabury-Peterson v. Jhamb,* 2011 ME 35, ¶ 18, 15 A.3d 746. Assessing damages is the responsibility of the jury and its judgment shall be given deference. *Id.* The court will not set aside a jury verdict on the ground that the damages are excessive "unless it is apparent that the jury acted under some bias, prejudice or improper influence, or have made some mistake of fact or law." *Pelletier v. Fort Kent Golf Club*, 662 A.2d 220, 224 (Me. 1995) (internal quotation and citation omitted). The moving party has the burden of establishing the jury verdict was improper. *Id.*

However, a new trial "shall not be granted solely on the ground that the damages are excessive until the prevailing party has first been given an opportunity to remit such portion

16

thereof as the court judges to be excessive." M.R. Civ. P. 59(a). In determining whether a jury award is excessive, the court examines the evidence in the light most favorable to the verdict. *Seabury-Peterson*, 2011 ME 35, ¶ 19, 15 A.3d 746. The court first determines whether the verdict bears any rational relationship to the evidence. *Id.* If the verdict has no rational relationship to the evidence, then the court must next evaluate the jury's motivation for awarding excessive damages. *Id.* If the court determines that an excessive damages award was the result of an improper motive, a new trial is the appropriate remedy. *Id.* But where an excessive verdict results from a good faith mistake, the court may order a remittitur to the maximum permissible amount that a rational jury could award. *Id.*

B.    Analysis

Defendants assert that a new trial is warranted for the following reasons: (1) the jury's verdict was based on an error of fact and law and unsupported by the evidence at trial for all of the grounds set forth in Defendants' motion for judgment as a matter of law; (2) the court's instruction on lost profits was erroneous; and (3) the court's refusal to instruct the jury on the issue of termination and the $1,750,000.00 letter of credit was erroneous. (Defs. Mot. 15-16.) Defendants also assert that jury's award was grossly excessive. (*Id.* at 19.)

*1.    Defendants' motion for judgment as a matter of law*

As discussed above, there was sufficient evidence at trial that the jury could reasonably find that Defendants had acted in bad faith; that lender consent would have been obtained; that the jury could have found there was mutual assent to the Term Sheet; that the $1,750,000.00 letter of credit provision in the Precedent Agreement was not a limitation on EMEC's ability to seek damages against Defendants; and that the Subsidiary Defendants were also liable. Therefore, the jury's verdict was not the result of any error of law or fact discussed above.

17

## 2. *The court's instruction regarding lost profits*

Defendants argue that the court's instruction regarding lost profit damages was erroneous because lost profits damages for breach of an agreement to negotiate in good faith are not contemplated under Maine law. (Defs. Mot. 16.) Defendants assert that Maine courts have consistently distinguished between a preliminary "agreement to agree" and a binding agreement. (*Id.*) Defendants assert there is no Maine precedent for awarding lost profit damages where a final agreement has not been reach and that the appropriate measure of damages for breach of an agreement to negotiate is solely the plaintiff's reliance damages. (*Id.* at 16-18.)

"Jury instructions are reviewed in their entirety to determine whether they fairly and correctly apprised the jury in all necessary respects of the governing law." *Frustaci v. City of S. Portland*, 2005 ME 101, ¶ 15, 879 A.2d 1001 (internal citation and quotation marks omitted).

Defendants are correct that Maine courts have distinguished between an "agreement to agree" and a binding agreement. *See McClare*, 2014 ME 4, ¶ 20, 86 A.3d 22; *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 6, 968 A.2d 539. However, this has been in the context of deciding whether there is mutual assent to a binding agreement or simply preliminary agreement to the terms of a future agreement. *Id.* In this case, however, the parties agreed there was a binding contract, the Precedent Agreement, that required the parties to negotiate in good faith. Therefore, the question is the appropriate measure of damages for breach of a binding agreement to negotiate in good faith.

In *Venture Associates Corporation v. Zenith Data Systems Corporation*, the Seventh Circuit stated:

> Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the

18

party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damages--the expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. **But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss--liable, that is, for the plaintiff's consequential damages.** ... The difficulty, which may well be insuperable, is that since by hypothesis the parties had not agreed on *any* of the terms of their contract, it may be impossible to determine what those terms would have been and hence what profit the victim of bad faith would have had. ... But this goes to the practicality of the remedy, not the principle of it.

*Venture Assocs. Corp.*, 96 F.3d at 278-79 (bold supplied, italics in original, citations omitted). Thus, under the Seventh Circuit's holding, if a plaintiff can prove that but for the defendant's bad faith the parties would have reached a final agreement and the resulting losses are reasonably foreseeable, then the plaintiff may recover their consequential or expectancy damages.

The Seventh Circuit's reasoning and its holding are consistent with Maine law and the Restatement (Second) of Contracts. Under Maine law, "Damages for a breach of contract are generally based on the injured party's expectation interest, defined as its interest in having the benefit of its bargain by being put in as good a position as it would have been in had the contract been performed." *Ford Motor Co. v. Darling's*, 2016 ME 171, ¶ 40, 151 A.3d 507 (internal quotation and citation omitted); *see also* Restatement (Second) Contracts § 347 & cmt. a ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."). "In a breach of contract action, those damages that were reasonably within the contemplation of the contracting parties when the agreement was made and which would naturally flow from a breach thereof may be recovered." *See Rubin v. Matthews Int'l Corp.*, 503

19

A.2d 694, 696 (Me. 1986) (internal quotation marks and citation omitted); *see also* Restatement (Second) Contracts § 351 ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.").

Further under Maine law, "Prospective profits are allowable only if they can be estimated with reasonable certainty. ... Although opinion evidence regarding lost profits is admissible, it must be an informed opinion based on facts that the fact-finder can evaluate." *Rutland v. Mullen*, 2002 ME 98, ¶ 22, 798 A.2d 1104 (internal quotation and citation omitted); *see also* Restatement (Second) Contracts § 347 & cmt. b ("Where the injured party's expected advantage consists largely or exclusively of the realization of profit, it may be possible to express this loss in value in terms of money with some assurance."); Restatement (Second) Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

Therefore, the court did not err in instructing the jury that, in order to award lost profits as damages for the benefit of the bargain, the plaintiff must prove that one or more defendants acted in bad faith; that but for the bad faith, the parties would have reached a final agreement; that the loss of the final agreement was a foreseeable result of the bad faith; and the damages must be proven to a reasonable degree of certainty.

> 3. *The court's refusal to instruct the jury regarding the $1,750,000.00 letter of credit*

At trial, Defendants requested that the court give the jury a separate instruction regarding the termination of the Precedent Agreement and whether the $1,750,000.00 letter of credit was contemplated by the parties as EMEC's sole remedy if a definitive agreement was not reached. The court declined Defendants' request. Defendants argue that the court's refusal deprived

20

Defendants of its defense that the letter of credit was the sole remedy contemplated under the Precedent Agreement and all the relief EMEC was entitled to receive. (Defs. Mot. 18-19.)

A party is entitled to a requested jury instruction if it: (1) correctly states the law; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions. *Semian*, 2014 ME 141, ¶ 24, 106 A.3d 405.

The court instructed the jury that the damages recoverable by EMEC must have been foreseeable. The court stated that the damages must be the probable result of the breach of contract that Defendants had reason to foresee when the contract was made. The court further instructed the jury that Defendants are not liable for damages that they had no reason to foresee as the probable result of the breach of contract. The court's instruction correctly stated the law regarding contract damages. *See Rubin*, 503 A.2d at 696; Restatement (Second) Contracts § 351. At trial, Defendants argued to the jury that, under ¶ 2 of the Precedent Agreement, the $1,750,000.00 letter of credit was the sole remedy contemplated by the parties if a definitive agreement was not reached and that the $1,750,000.00 were the only foreseeable damages. The jury clearly rejected this argument and found that EMEC's lost profits were a reasonably foreseeable result of a breach of the Precedent Agreement at the time the contract was made.

The court's instruction regarding contract damages sufficiently explained the law applicable to Defendants' argument regarding the $1,750,000.00 letter of credit. Moreover, a separate instruction regarding the termination of the Precedent Agreement and whether the $1,750,000.00 letter of credit was the only foreseeable damages could have misled or confused the jury by highlighting an issue already subsumed by the court's contract damages instruction, giving the issue undue weight. Therefore, the court did not err in declining to give the jury a

21

separate instruction regarding the termination of the Precedent Agreement and the $1,750,000.00 letter of credit.

### 4. Whether the jury's award was excessive

Lastly, Defendants assert, as they have throughout their motion, that the jury's award of $13,604,400.00 in lost profits was excessive because it was unsupported by the evidence and not foreseeable. (Defs. Mot. 14, 19-20.) As previously discussed, in determining whether a jury award is excessive, the court must first determine whether the verdict bears any rational relationship to the evidence. *Seabury-Peterson*, 2011 ME 35, ¶ 19, 15 A.3d 746. As previously discussed, in order to award lost profits, the evidence at trial must demonstrate that EMEC's lost profits were a foreseeable result of the breach when the contract was made, and the lost profits must be proven to a reasonable certainty. *Venture Assocs. Corp.*, 96 F.3d at 278; *Rubin*, 503 A.2d at 696; *Rutland*, 2002 ME 98, ¶ 22, 798 A.2d 1104; Restatement (Second) of Contracts §§ 347 cmt. b, 351-52.

The Precedent Agreement and attached Term Sheet were submitted to the jury, (Jt. Ex. 45.) Appendix I to the Term Sheet set forth the annual transmission revenue to be paid each year to EMEC over the span of forty-five years. (*Id.*) EMEC's expert Robert Strong testified, based on those revenues, that EMEC's lost profits were $13,604,400.00. That testimony was not controverted by Defendants. Because the Precedent Agreement and attached Term Sheet set forth the amount of revenue to be paid to EMEC each year, the jury could reasonably find that EMEC's lost profits were reasonably foreseeable to parties at the time the Precedent Agreement was made. Based on Strong's testimony the jury could also reasonably find that EMEC had proven its damages to a reasonable certainty. Thus, the jury's award was rationally related to the evidence presented at trial. Moreover, there is no evidence in the record suggesting that the

22

jury's award was the result of bias, prejudice, or improper influence. Therefore, the jury's award was not excessive.

### C. Conclusion

Because the court's instructions were not erroneous and the jury's award was rationally related to the evidence presented at trial, Defendants are not entitled to a new trial or remittitur.

## III. PLAINTIFF'S MOTION FOR IMMEDIATE EXECUTION OR THAT DEFENDANTS GIVE A BOND PENDING APPEAL

### A. Standard of Review

Maine Rule of Civil Procedure 62 provides, "In its discretion, the court on motion may, for cause shown and subject to such conditions as it deems proper, order execution to issue at any time after the entry of judgment and before an appeal from the judgment has been taken or a motion made pursuant to Rule 50, 52(b), 59, or 60;…" M.R. Civ. P. 62(c). However, "no such order shall issue if a representation, subject to the obligations set forth in Rule 11, is made that a party intends to appeal or to make such motion." *Id.*

When an order for immediate execution is denied, "the court may, upon a showing of good cause, at any time prior to appeal or during the pendency of an appeal order the party against whom execution was sought to give bond in an amount fixed by the court conditioned upon satisfaction of the damages for delay, interest, and costs if for any reason the appeal is not taken or is dismissed, or if the judgment is affirmed." *Id.*

### B. Analysis

EMEC requests that the court enter an order for immediate execution of the judgment, or in the alterative, an order requiring Defendants to post a bond. (Pl. Mot. 3.) EMEC filed its motion for immediate execution on December 1, 2016. On December 5, 2016, Defendants filed their renewed motion for judgment as a matter of law or a new trial pursuant to Maine Rules of

23

Civil Procedure 50 and 59. Defendants also filed an opposition to EMEC's bill of costs on December 9, 2016, in which Defendants represent that they intend to file an appeal. (Defs. Opp'n to Pl. Bill of Costs 1.) "There is an absolute bar against the order for immediate execution if a representation is made by counsel that an appeal is to be taken or a postjudgment motion made." 3 Harvey, *Maine Civil Practice* § 62:4 at 313 (3d ed. 2011). Because Defendants have filed a post-trial motion and represent that they intend to file an appeal, EMEC is not entitled to an order for immediate execution.

In the alternative, EMEC assert there is good cause to require Defendants to post a bond in the amount of $937,718.76. (Pl. Mot. 3-5.) EMEC's arguments in support of good cause focus on its ability to collect any judgment against Defendants. (*Id.*; Pl. Reply 2-6.)

A bond under Rule 62(c) is intended to satisfy only the damages, interest, and costs arising from the delay of execution. 3 Harvey, *Maine Civil Practice* § 62:4 at 313-14. The 1959 Reporter's Notes to the Rule make clear that the purpose of Rule 62(c)'s bond provision is to deter frivolous appeals by requiring the defendant to post a bond for any additional damages, interest, and costs accrued during the pendency of an appeal. M.R. Civ. P. 62, Reporter's Notes, December 1, 1959 (stating Rule 62(c) "would seem to offer some deterrent to the frivolous appeal...").

Rule 62(c) is not intended to protect a plaintiff's ability to collect on the judgment. Moreover, EMEC's arguments regarding its ability to collect against Defendants based on financial disclosures and bankruptcy filings of related companies not a part of this litigation are attenuated and speculative. Therefore, EMEC's ability collect judgment against Defendants is not sufficient good cause to require Defendants to post a bond pursuant to Rule 62(c). Thus, EMEC's motion for immediate execution or a bond must be denied.

24

## IV. PLAINTIFF'S BILL OF COSTS

Lastly, EMEC has filed a bill of costs pursuant to Maine Rule of Civil Procedure 54 and 14 M.R.S § 1501 *et seq.* EMEC initially sought an order approving its bill of costs in the amount of $33,482.36. (Pl. Bill of Costs 3.) Defendants objected to EMEC's bill of costs asserting that certain costs are unrecoverable as a matter of law and that other costs are unreasonable. (Defs. Opp'n to Pl. Bill of Costs 2-5.) In its reply, EMEC concedes that expenses for expert witness travel time are not recoverable as a matter of law. (Pl. Reply to Defs. Opp'n to Pl. Bill of Costs 3 n.1.) EMEC now seeks an order approving its bill of costs in the amount of $31,082.36. (*Id.* at 6.)

The Law Court has vacated awards of costs where the original judgment is vacated on appeal because the factual determination of which party prevailed is subject to change following remand to the trial court. *See Flaherty v. Muther (Flaherty I)*, 2011 ME 32, ¶ 89, 17 A.3d 640. In *Flaherty II*, the Law Court stated that, although a trial court may entertain a motion for attorney's fees during the pendency of appeal, "it may be better practice for the trial court to defer action on applications for attorney fees until the conclusion of the appeal period and entry of final judgment." *Flaherty v. Muther (Flaherty II)*, 2011 ME 34, ¶ 8 n.4, 17 A.3d 663. The Law Court further explained, "Doing so will eliminate the need for the trial court to modify, rescind, or reconsider its order on attorney fees in the event that the appeal results in a change to the outcome of the case." *Id.*

The court sees no reason why the Law Court's rationale for deferring action on an application for attorney's fees in *Flaherty II* during the pendency of an appeal does not equally apply to EMEC's bill of costs in this case. Defendants have represented that they intend to appeal the judgment entered against them. (Defs. Opp'n to Pl. Bill of Costs 1.) Thus, the

25

prevailing party in this case is potentially subject to change. Deferring action on EMEC's bill of costs until the expiration of the appeal period or the conclusion of any appeal to the Law Court will eliminate the need for the court to later modify, rescind, or reconsider any award of costs. Therefore, the court elects to defer action on EMEC's bill of costs pending the expiration of the appeal period or the conclusion of any appeal to the Law Court.

## V. CONCLUSIONS

Based on the foregoing, the court's entry is as follows:

(1) Defendants' renewed motion for judgment as a matter of law is **DENIED**.

(2) Defendants' motion for a new trial or remittitur is **DENIED**.

(3) Plaintiff's motion for immediate execution or an order requiring Defendants' to give a bond is **DENIED**.

(4) The court defers consideration of Plaintiff's bill of costs pending the expiration of the appeal period or any appeal to the Law Court.

Pursuant to Maine Rule Civil Procedure 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: April 13, 2017

M. Michaela Murphy
**Justice, Business and Consumer Court**

Entered on the Docket: 4/14/17
Copies sent via Mail___Electronically ✓

26

**Eastern Maine Electric Cooperative, Inc. v. First Wind Holdings, LLC, et al.**

**BCD-CV-2015-48**

**Eastern Maine Electric Cooperative**

    **Plaintiff**

        Counsel:               *Seth Brewster, Esq.*
                                 One Portland Square 7th floor
                                 PO Box 15235
                                 Portland, ME 04112-5235

**First Wind Holdings, LLC, et al.**

    **Defendant**

        Counsel:               *George Dilworth, Esq.*
                                 84 Marginal Way Suite 600
                                 Portland, ME 04101-2480

STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO.  BCD-CV-15-048    ✓

EASTERN MAINE ELECTRIC
COOPERATIVE, INC.,

   Plaintiff,

  v.

FIRST WIND HOLDINGS, LLC,
FIRST WIND NORTHEAST
COMPANY, LLC,
NORTHEAST WIND PARTNERS II, LLC,
STETSON WIND HOLDINGS
COMPANY, LLC,
ROLLINS HOLDINGS, LLC,
STETSON HOLDINGS, LLC,
STETSON WIND II, LLC,
EVERGREEN WIND POWER III, LLC,
CHAMPLAIN WIND, LLC,
EVERGREEN GEN LEAD, LLC,
FIRST WIND ENERGY, LLC, and
FIRST WIND MAINE HOLDINGS, LLC,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Defendants have moved pursuant to Maine Rule of Civil Procedure 56 for partial summary judgment on all counts against Defendants Evergreen Wind Power III, LLC, Stetson Holdings, LLC, Stetson Wind II, LLC, and Evergreen Gen Lead, LLC and the other subsidiaries of First Wind Holdings, LLC (collectively, the "Subsidiary Entities"). For the reasons discussed below, Defendants' motion for partial summary judgment is denied.

## I. BACKGROUND

Plaintiff Eastern Maine Electric Cooperative, Inc. ("EMEC") is a non-profit, member-owned electric cooperative. (Pl. Add'l S.M.F. ¶ 1; Defs. Reply S.M.F. ¶ 1.) During the relevant time period, from 2011 to 2014, Defendant First Wind Holdings, LLC ("First Wind") owned and

operated various wind projects through a family of wholly-owned holding companies, i.e., the Subsidiary Entities. (*Id.* ¶ 4.) One of First Wind's projects was a 38-mile long transmission line known as the Evergreen Gen Lead Line or Stetson Line (hereafter, the "Stetson Line"), which connected three operating wind farms to the regional electric grid. (Defs. Supp'g S.M.F. ¶ 1; Pl. Opp. S.M.F. ¶ 1; Pl. Add'l S.M.F. ¶ 6; Defs. Reply S.M.F. ¶ 6.) The Stetson Line is owned by Defendant Evergreen Gen Lead, LLC. (Pl. Add'l S.M.F. ¶ 5; Defs. Reply S.M.F. ¶ 5.) Evergreen Gen Lead, LLC is majority-owned by Defendants Evergreen Wind Power III, LLC, Stetson Holdings, LLC, and Stetson Wind II, LLC, which own the three operating wind farms. (Defs. Supp'g S.M.F. ¶ 3; Pl. Opp. S.M.F. ¶ 3.) Evergreen Wind Power III, LLC, Stetson Holdings, LLC, Stetson Wind II, LLC, and Evergreen Gen Lead, LLC are all direct or indirect subsidiaries of First Wind. (*Id.* ¶ 4.)

Sometime in 2011, EMEC, Bangor Hydro Electric, Inc. ("Bangor Hydro") and its parent Emera, Inc., and First Wind sought to enter into a sale-and-leaseback agreement involving the Stetson Line (hereafter, the "Stetson Line Transaction" or the "Transaction"). (Defs. Supp'g S.M.F. ¶ 5; Pl. Opp. S.M.F. ¶ 5; Pl. Add'l S.M.F. ¶ 11; Defs. Reply S.M.F. ¶ 11.) To effectuate the agreement, the parties executed a "Term Sheet," which set forth the terms of the Stetson Line Transaction. (Pl. Add'l S.M.F. ¶ 18; Defs. Reply S.M.F. ¶ 18; Compl. Ex A.) The Term Sheet itself was not a binding contract. (Defs. Mot. Summ. J. 2; Compl. Ex A at 3, 10.) The Term Sheet contemplated that EMEC would purchase 33% (12.54 miles) of the Stetson Line for $9.9 million and charge the wind farms connected to the line a fee to use the line. (Pl. Add'l S.M.F. ¶ 12; Defs. Reply S.M.F. ¶ 12; Compl. Ex A at 2.) Bangor Hydro would purchase the remaining 66% (25.46 miles) of the Stetson Line and charge the wind farms connected to the line a fee to use the transmission line. (*Id.* ¶ 13; Compl. Ex. A at 2.)

2

Certain aspects of the Term Sheet needed to be effectuated immediately before a final, definitive agreement for the Stetson Line Transaction could be negotiated between the parties. (*Id.* ¶ 20.) Specifically, at the same time the parties were negotiating the Stetson Line Transaction, EMEC and First Wind were also involved in a regulatory proceeding before the Maine Public Utilities Commission ("PUC"). (*Id.*) First Wind and Bangor Hydro insisted that EMEC withdraw from the PUC proceeding before negotiations of the Stetson Line Transaction could be completed. (*Id.*) EMEC insisted that First Wind agree to be contractually bound to complete the Stetson Line Transaction in good faith before EMEC would withdraw from the PUC proceeding. (*Id.* ¶ 21.) Thus, on December 23, 2011, the parties entered into a binding "Precedent Transmission Line Agreement" (hereafter, the "Precedent Agreement"), which incorporated by reference the terms contained in the Term Sheet. (*Id.* ¶ 18; Compl. Ex B at 1.) The Precedent Agreement obligated the parties to "proceed in good faith to negotiate, draft, execute and deliver" a definitive agreement implementing the provisions of the Term Sheet. (*Id.* ¶ 22; Compl. Ex. B at 2.) The parties were ultimately unable to reach a definitive agreement regarding the Stetson Line Transaction.

EMEC filed a complaint with the Superior Court on October 24, 2014, against First Wind and eleven of its Subsidiary Entities. EMEC's complaint asserts contract claims for breach of contract (Count I), promissory estoppel (Count II), and unjust enrichment (Count III) and tort claims for fraud (Count IV) and negligent misrepresentation (Count V) against First Wind and its Subsidiary Entities. This action was then transferred to the Business and Consumer Docket. On July 8, 2016, Defendants moved for partial summary judgment on all claims against the Subsidiary Entities, which would leave First Wind Holdings, LLC as the only defendant in this

3

action.[1] Following an extension of time, EMEC filed its opposition to summary judgment on July 29, 2016. Defendant filed their reply on August 12, 2016.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. A fact is material if it can affect the outcome of the case. *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). A genuine issue of material fact exists if the fact finder must choose between competing versions of the truth. *Id.* When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

If the moving party's motion for summary judgment is properly supported, the burden shifts to the non-moving party to respond with specific facts establishing a prima facie case for each element of the claim challenged by the moving party. M.R. Civ. P. 56(e); *Chartier v. Farm Family Life Ins. Co.*, 2015 ME 29, ¶ 6, 113 A.3d 234. If the non-moving party fails to present sufficient evidence of the challenged elements, then the moving party is entitled to a summary judgment. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. Even if one party's version of the facts appears more credible and persuasive, any genuine issue of material fact must be

---

[1] Technically speaking, Defendants have moved for summary judgment on all claims against only the Subsidiary Entities that own the Stetson Line and the connected wind farms. Defendants have named only Evergreen Wind Power III, LLC, Stetson Holdings, LLC, Stetson Wind II, LLC, and Evergreen Gen Lead, LLC in their motion for summary judgment. (Defs. Mot. Summ. J. 1.) However, in a footnote, Defendants assert their arguments for summary judgment equally apply to all of the other Subsidiary Entities named as defendants in the complaint, i.e., that none of the Subsidiary Entities were parties to the Precedent Agreement and First Wind was not acting as their agent. (*Id.* at 1 n.1.) Therefore, although only four of the eleven Subsidiary Entities are expressly named in the motion, the court shall treat the Defendants' motion as one for summary judgment on all claims against all of the Subsidiary Entities.

4

resolved by the fact finder, regardless of the likelihood of success. *Estate of Lewis v. Concord Gen. Mut. Ins. Co.*, 2014 ME 34, ¶ 10, 87 A.3d 732.

## III.   ANALYSIS

In their motion for summary judgment, Defendants argue all of EMEC's claims arise from the acts or conduct of First Wind and the Subsidiary Entities are not liable for First Wind's actions. (Defs. Mot. Summ. J. 5.) With regard to EMEC's contract claims, Defendants assert the Subsidiary Entities are not parties to the Precedent Agreement and there was no separate agreement between EMEC and the Subsidiary Entities to negotiate in good faith. (*Id.* at 9.) Defendants assert that EMEC is attempting to hold the Subsidiary Entities liable for promises made by First Wind under a theory of agency. (*Id.* at 5.) Defendants argue the Subsidiary Entities cannot be held liable for the actions of First Wind under a theory of agency because there is no evidence that the Subsidiary Entities exerted control over the parent in order to for First Wind to be deemed their agent. (*Id.* at 6-7.)

With regard to EMEC's claims for fraud and negligent misrepresentation, Defendants similarly argue the Subsidiary Entities had no direct involvement in the negotiations of the Stetson Line Transaction and that First Wind was not acting as their agent. (*Id.* at 10-11.) Thus, according to Defendants, there is no evidence the Subsidiary Entities or their agent made false statements of material fact or supplied false information in order to hold the Subsidiary Entities liable for fraud or negligent misrepresentation. (*Id.*)

In response to Defendants' motion, EMEC argues the Subsidiary Entities were parties to Precedent Agreement and are directly bound by its terms. (Pl. Opp'n to Defs. Mot. Summ. J. 9.) Alternatively, EMEC argues that there are genuine issues of material fact regarding whether the Subsidiary Entities exerted control over First Wind, making it the Subsidiary Entities' agent, or

5

whether the Subsidiary Entities are liable for the actions of First Wind under the doctrines of apparent authority, estoppel, or ratification. (*Id.* at 11-18.) EMEC also argues that there are questions of material fact whether the corporate veil between First Wind and the Subsidiary Entities should be pierced and the Subsidiary Entities should be held liable as the alter egos of First Wind. (*Id.* at 19-20.)

A.    Contract Claims

The Precedent Agreement is ambiguous as to whether the Subsidiary Entities are parties to the agreement, and there are genuine issues of material fact regarding whether the parties intended the Subsidiary Entities to be bound by the terms of the Precedent Agreement. The interpretation of an unambiguous contract is a question of law for the court. *Town of Lisbon v. Thayer Corp.*, 675 A.2d 514, 516 (Me. 1996). However, if a contract is ambiguous, then its interpretation is a question of fact that must be determined by the fact finder. *Id.* The determination of whether a contract is ambiguous is a question of law for the court. *Id.* Contract language is ambiguous when it is reasonably susceptible to different interpretations. *Id.* If a contract is found to be ambiguous, the court may consider extrinsic evidence to determine the parties' intent. *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457. When a contract is ambiguous and there are genuine issues of material fact regarding the intent of the parties, summary judgment is inappropriate. *Thayer Corp.*, 675 A.2d at 516.

First, the Precedent Agreement is ambiguous as to whether the Subsidiary Entities are parties to the agreement. The Precedent Agreement was signed by Paul Gaynor on behalf of First Wind. (Defs. Supp'g S.M.F. ¶ 6; Compl. Ex. B at 5.) None of the Subsidiary Entities were signatories to the Precedent Agreement. (*Id.*; Compl. Ex. B at 4-5.) The final paragraph of the agreement states, "each Party hereto has caused this Precedent Transmission Line Agreement to

6

be signed *on its behalf* as of the Execution Date first written above." (Pl. Add'l S.M.F. ¶ 28; Defs. Reply S.M.F. ¶ 28; Compl. Ex. B at 4) (emphasis supplied).

However, the Precedent Agreement also states that it was made and entered into by First Wind "on behalf of itself *and any of its subsidiaries* involved in the transactions related to the Term Sheet." (Pl. Opp. S.M.F. ¶ 6; Compl. Ex. B at 1) (emphasis supplied). There is no language in the Precedent Agreement expressly stating that the agreement was only made and entered into by First Wind and that the Subsidiary Entities are not bound its terms. (Pl. Add'l S.M.F. ¶ 26; Defs. Reply S.M.F. ¶ 26; Compl. Ex. B.)

The Precedent Agreement further states that the "Parties" agreed to negotiate a definitive agreement in good faith to implement the provisions of the Term Sheet. (Defs. Supp'g S.M.F. ¶ 7; Compl. Ex. B at 2.) Specifically, the Precedent Agreement states, "the Parties shall agree... to transfer ownership interests in the Gen-Lead Assets, as defined in the Term Sheet," to Bangor Hydro and EMEC. (Compl. Ex. B at 2.) The Term Sheet defines the "Gen-Lead Assets" as certain assets owned by Evergreen Gen Lead, LLC, a subsidiary of the owners of the "Gen-Lead Projects." (Compl Ex. A at 1.) According to the Term Sheet, the owners of the "Gen-Lead Projects" were "subsidiaries of First Wind Holdings, LLC." (*Id.*) Because certain Subsidiary Entities were the owners of the Gen-Lead Assets and the Term Sheet contemplates that those subsidiaries would transfer ownership interest, this language seems to suggest that certain Subsidiary Entities were parties to the agreement.

The Precedent Agreement also states, "as provided in the Term Sheet, the Parties will negotiate the following documents concurrently with the negotiation of the definitive agreement: transmission service agreements,..." (Defs. Supp'g S.M.F. ¶ 9; Compl. Ex. B at 2.) Pursuant to the Term Sheet, "each of the owners of the Gen-Lead Projects" would enter into separate

7

transmission service agreements with EMEC and Bangor Hydro regarding transmission services over the Stetson Line. (Defs. Supp'g S.M.F. ¶ 9; Compl. Ex. B at 2; Ex. A at 2.) Based on this language, it appears that the parties to the Precedent Agreement and the Term Sheet understood that certain Subsidiary Entities could act alone and do not always act through First Wind. However, it also suggests, again, that certain Subsidiary Entities were necessary parties to the agreement. Therefore, based on the foregoing, the court finds the Precedent Agreement to be ambiguous as to whether the Subsidiary Entities are parties to the agreement.

Second, there are genuine issues of material fact regarding whether the parties intended the Subsidiary Entities to be bound by the terms of the Precedent Agreement. The Subsidiary Entities were "special purpose entities" that did not have their own employees. (Pl. Add'l S.M.F. ¶ 43; Defs. Reply S.M.F. ¶ 43.) First Wind's employees generally provided services to the Subsidiary Entities. (*Id.* ¶ 44.) First Wind and the Subsidiary Entities also shared the same executives. (*Id.* ¶ 45.) First Wind's top executives, Paul Gaynor and Michael Alvarez, were the President, Chief Executive Officer, or Vice President of all the Subsidiary Entities. (*Id.*) First Wind and the Subsidiary Entities also shared other executives and the same corporate address. (*Id.* ¶¶ 53-69, 89.)

Defendants admit that First Wind, at times, acted on behalf of the Subsidiary Entities. (Defs. Reply S.M.F. ¶ 79.) Defendants further conceded at oral argument that First Wind could bind the Subsidiary Entities to a contract. In fact, First Wind had previously entered into agreements regarding the Stetson Line Transaction on behalf of its Subsidiary Entities. In 2011, prior to the Precedent Agreement, "First Wind Holdings, LLC, its affiliates and subsidiaries (collectively 'First Wind')" entered into a confidentiality agreement with EMEC. (Pl. Add'l S.M.F. ¶ 36; Defs. Reply S.M.F. ¶ 36.) That confidentiality agreement purportedly contained

8

representations of authority and was executed by Kurt Adams as Executive Vice President and Chief Operating Officer of First Wind. (*Id.* ¶ 37.)

Scott Hallowell, EMEC's Chief Operating Officer, has testified that First Wind executives used the term "First Wind" broadly throughout the Stetson Line negotiations to refer, without distinction, to both the parent company and the Subsidiary Entities that owned the relevant assets. (Pl. Add'l S.M.F. ¶¶ 77-78.) Hallowell further testified that First Wind executives were working on behalf of the Subsidiary Entities involved in the Transaction and that the executives made no attempt to differentiate their actions on behalf of one company from those on behalf of another. (*Id.* ¶¶ 79-80). Hallowell asserts that First Wind executives never suggested the Subsidiary Entities were not parties to the Precedent Agreement or that they were not authorized to act on behalf of the Subsidiary Entities regarding the Stetson Line Transaction. (*Id.* ¶ 96.)

Defendants assert that, while the term "First Wind" was generally used by First Wind employees throughout the Stetson Line Transaction, it was understood by all parties that First Wind employees were acting only on behalf of the parent. (Defs. Reply S.M.F. ¶¶ 77, 96.) Defendants assert that there were attempts to differentiate the First Wind from the Subsidiary Entities during the negotiations. (*Id.* ¶ 79.) Defendants cite the Term Sheet, which differentiated between the First Wind and the Subsidiary Entities, an earlier draft of the Term Sheet, which corrected which entities would be entering into subsequent agreements, and a draft of the definitive agreement, which defined "First Wind" solely as "First Wind Holdings, LLC." (*Id.* ¶ 79; Compl. Ex A.; Horowitz Dep. Ex. 83; Chasse Dep. Ex. 45.)

Based on the foregoing, there are genuine issues of material fact regarding whether the parties intended the Subsidiary Entities to be bound by the terms of the Precedent Agreement.

9

Therefore, Defendants' motion for summary judgment on EMEC's contract claims against the Subsidiary Entities must be denied. Because the Precedent Agreement is ambiguous as to whether the Subsidiary Entities are parties to the agreement and there are genuine issues of material fact regarding the parties' intentions, the court does not reach and does not decide the parties' arguments regarding agency, actual authority, apparent authority, estoppel, ratification, or alter ego theory.

B.    Fraud and Negligent Misrepresentation

To prevail on a claim for fraud, a plaintiff must prove by clear and convincing evidence that (1) the defendant a made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of its truth or falsity; (4) for the purpose of inducing the plaintiff to act in reliance upon it; and (5) the plaintiff justifiably relied upon the fact as true to their detriment. *Me. Eye Care Assocs., P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707.

Similarly, to prevail on a claim for negligent misrepresentation, a plaintiff must prove that (1) in the course of a business, profession, employment or any other transaction in which the defendant has a pecuniary interest; (2) the defendant supplied false information; (3) for the guidance of others in the business transactions; (4) and the defendant failed to exercise reasonable care or competence in obtaining or communicating the information; (5) causing the plaintiff to justifiably rely upon the information as true to the plaintiff's detriment. *St. Louis v. Wilkinson Law Offices, P.C.*, 2012 ME 116, ¶ 18, 55 A.3d 443.

As discussed above, Defendants' only argument is that the Subsidiary Entities are not liable for fraud or negligent misrepresentation because the Subsidiary Entities had no direct involvement in the negotiations of the Stetson Line Transaction and First Wind was not acting as

10

their agent. (Defs. Mot. Summ. J. 10-11.) Thus, according to Defendants, there is no evidence the Subsidiary Entities made false statements of material fact or supplied false information. (*Id.*)

There are genuine issues of material fact regarding whether First Wind employees involved in the negotiations were acting on behalf of the Subsidiary Entities. As previously discussed, the Subsidiary Entities were "special purpose entities" that did not have their own employees. (Pl. Add'l S.M.F. ¶ 43; Defs. Reply S.M.F. ¶ 43.) First Wind and the Subsidiary Entities shared the same executives, employees, and the same corporate address. (*Id.* ¶¶ 45-69, 89.) First Wind's employees generally provided services to the Subsidiary Entities. (*Id.* ¶ 44.) Defendants admit that First Wind could, and at times did, act on behalf of the Subsidiary Entities. (Defs. Reply S.M.F. ¶ 79.)

EMEC's Chief Operating Officer, Hallowell, testified that First Wined executives used the term "First Wind" throughout the negotiations to refer to both the parent company and the Subsidiary Entities. (Pl. Add'l S.M.F. ¶¶ 77-78.) Hallowell testified that First Wind executives working on behalf of the Subsidiaries Entities involved in the Transaction made no attempt to differentiate their actions on behalf of one company from those on behalf of another. (*Id.* ¶¶ 79-80). Hallowell asserts that the First Wind executives never suggested that they were not authorized to act on behalf of the Subsidiary Entities regarding the Stetson Line Transaction. (*Id.* ¶ 96.)

Defendants assert that, while the term "First Wind" was generally used by First Wind employees throughout the Stetson Line Transaction, it was understood by all parties that First Wind employees were acting only on behalf of the parent. (Defs. Reply S.M.F. ¶¶ 77, 96.) Defendants assert that there were attempts to differentiate the First Wind from the Subsidiary

11

Entities during the negotiations. (*Id.* ¶ 79; Compl. Ex A.; Horowitz Dep. Ex. 83; Chasse Dep. Ex. 45.)

Based on the foregoing, there are genuine issues of material fact regarding whether First Wind employees involved in the Stetson Line Transaction were acting on behalf of the Subsidiary Entities. Thus, there are genuine issues of material fact regarding whether the Subsidiary Entities made false statements of material fact or supplied false information. Therefore, Defendants' motion for summary judgment on EMEC's claims against the Subsidiary Entities for fraud and negligent misrepresentation must be denied.

## IV. CONCLUSION

Defendants' motion for partial summary judgment on all counts against Defendants Evergreen Wind Power III, LLC, Stetson Holdings, LLC, Stetson Wind II, LLC, and Evergreen Gen Lead, LLC and the other subsidiaries of First Wind Holdings, LLC is **DENIED**.

Pursuant to Maine Rule of Civil Procedure 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: 10\3\16

Michaela Murphy
Justice, Business and Consumer Court

Entered on the Docket: 10·4·16
Copies sent via Mail___ Electronically ✓

12