2011 ME 35

**Donna SEABURY–PETERSON et al.**

v.

**Kristen K. JHAMB et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 12, 2011.

Decided: March 22, 2011.

Christopher D. Nyhan, Esq. (orally), Katherine W. Fawcett, Esq., Preti Flaherty, Portland, ME, for Kristen K. Jhamb and Mid–Coast Medical Group.

L. Scott Gould, Esq. (orally), Cape Elizabeth, ME, Elliott L. Epstein, Esq., Pickus & Epstein, LLC, Portland, ME, for Donna Seabury–Peterson and Joseph Peterson.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and JABAR, JJ.

JABAR, J.

[¶ 1]  A jury awarded Donna Seabury–Peterson and her husband, Joseph Peterson, more than $1.1 million in damages for the negligence of Kristen K. Jhamb, M.D. and Mid Coast Medical Group (collectively Mid Coast) in failing to diagnose Donna's recurrent breast cancer, which had metastasized to her bones.  Mid Coast argues that, in reaching its verdict, the jury was motivated by sympathy, confusion, or a prejudicial remark made by the Petersons during their closing argument, and appeals from the Superior Court's (Cumberland

County, *Crowley, J.*) denial of its motions for a mistrial and for a new trial. Finding no abuse of discretion in the denial of either motion, we affirm the judgment.

## I. FACTS AND PROCEDURE

[¶ 2] Donna Seabury–Peterson was diagnosed with stage two breast cancer in the fall of 1990, at age forty-three. She underwent a lumpectomy to remove a two-centimeter tumor and received radiation and chemotherapy. Following this treatment, Donna's cancer went into remission.

[¶ 3] Beginning in the summer of 2003, Donna started to experience pain in the area of her right hip. In mid-December 2004, Donna began seeing Dr. Kristen Jhamb of Mid Coast Medical Group as her primary care physician. At her first appointment with Jhamb, Donna disclosed her history of breast cancer, provided Jhamb a copy of her medical records, and described her current hip pain.

[¶ 4] Over the course of the next three years, Donna identified new areas of pain in her neck, chest, back, and sternum. Although over-the-counter pain medication would often supply temporary relief, Donna's pain never completely resolved. She complained of her pain to Jhamb and to various other health care providers who then informed Jhamb. For example, in September 2005, Jhamb received a report from Donna's massage therapist documenting that Donna complained of "8/10 constant pain" in her back and hip that had been "steadily getting worse over the past year" and interfered with her activities. In 2006, Donna showed Jhamb a painful bump on her sternum, which Jhamb considered "fine." Later that same year, Donna went to the emergency room complaining of acute chest pain, which she feared was a heart attack. Jhamb agreed with the emergency room physician that this pain was likely costochondritis, a temporary inflammation of cartilage in the rib cage. Jhamb's notes documenting Donna's pain and medical history were often incomplete, lacking details about the severity or frequency of Donna's pain and failing to document whether Jhamb had followed up on Donna's pain complaints from prior visits.

[¶ 5] Frustrated by the continuing pain, Donna began requesting procedures in an effort to diagnose herself. No cause was revealed and the pain continued to increase, forcing Donna to reduce her activities. She worked fewer hours as a teacher at a childcare center, even though she loved her job. She traveled less frequently to see her children and grandchildren. Donna stopped painting, boating, and gardening, all hobbies that she had previously enjoyed. Joseph assumed almost all of the responsibilities around the home and was no longer able to share an active lifestyle with his wife.

[¶ 6] In November 2007, due to what was thought to be work-related pain, Donna's employer directed her to Occupational Health Associates (OHA) for physical therapy and chiropractic treatment. When these methods failed to resolve Donna's pain, OHA ordered an MRI. The MRI suggested, and later testing confirmed, that Donna had cancer in her spine, ribs, and sternum—all places where she had previously complained of pain to Jhamb. The cancer was stage four, and it had likely been symptomatic for three to four years.

[¶ 7] Although there is no correlation between early detection of breast cancer metastasized to bone and a longer life expectancy, the point at which the cancer is found may influence treatment. Following her diagnosis, Donna began a regimen of palliative radiation and medication, which was aimed at controlling the cancer

and reducing Donna's pain. The radiation was initially effective in reducing her pain, but Donna experienced vertigo and fatigue. In addition, the radiation burned her esophagus and lungs. As a result, Donna takes medication daily to assist with breathing, but shortness of breath prevents her from walking more than one-half mile without rest and some days forces her to rest after brushing her teeth or taking a shower. According to Donna's oncologist, if her cancer had been detected earlier, radiation could have been delayed or possibly even avoided.

[¶ 8] Believing that Mid Coast was negligent in failing to diagnose Donna's metastatic breast cancer, the Petersons filed a complaint in the Superior Court.[1] They alleged that, due to Jhamb's suboptimal medical notes, she failed to detect the progression in Donna's pain that should have led to a diagnosis. The Petersons sought damages for Donna's pain and suffering and medical expenses, and for Joseph's loss of consortium.

[¶ 9] The Petersons presented their case to a jury in April 2010. During their closing argument, they emphasized the deterioration of Donna's quality of life caused by her untreated pain. While making this point, they stated, "No one would want to switch places right now more than Donna Peterson." Mid Coast objected and moved for a mistrial, arguing that the remark was an impermissible Golden Rule argument.

[¶ 10] The court sustained the objection and instructed the jury to disregard the Petersons' statement, but denied the motion for a mistrial. It also gave a curative instruction expressly condemning "[a]ny argument that invites you to compare or to contrast your situation with [Donna's] situation or [that] talk[s] about

swapping places." Later, the court instructed the jury that in measuring Donna's pain and suffering they could properly consider "to the extent proven by a preponderance of the evidence, ... any fear, pain, discomfort, anxiety or other mental or emotional distress, including the loss of enjoyment of life suffered by [Donna] as a [result] of [Mid Coast's] negligence." The court also instructed the jury that opening and closing arguments were not evidence and explained that damages could not be awarded "on the basis of prejudice or sympathy."

[¶ 11] The jury unanimously found Mid Coast negligent and awarded $160,000 for past medical expenses, $700,000 for pain and suffering, and $300,000 for loss of consortium. Mid Coast moved to vacate the verdict as "irrational" and "not based on evidence" because the medical expenses awarded exceeded the amount in evidence; the only documented evidence of Donna's medical expenses was a bill for radiation services totaling $12,267.50.

[¶ 12] The court found that, on its face, the verdict was not "necessarily internally inconsistent," but that the medical expenses award was inconsistent with the evidence presented. Upon Mid Coast's post-judgment motion for a new trial, the court agreed to grant a new trial unless the Petersons consented to remit the portion of the jury award for Donna's past medical expenses exceeding $12,267.50. *See* M.R. Civ. P. 59(a). The Petersons accepted the remittitur in lieu of a new trial, and the court then entered an amended judgment reflecting total damages of $1,012,267.50.

## II. DISCUSSION

[¶ 13] On appeal, Mid Coast argues that it was entitled to a new trial, asserting

1. They filed their complaint following the prelitigation screening panel's determination that Jhamb had not deviated from the standard of care in treating Donna. *See* 24 M.R.S. §§ 2851–2859 (2010).

two grounds for its contention: (A) the Petersons' remark during closing argument was so prejudicial that declaring a mistrial was the only appropriate remedy, and (B) the jury's disregard for the evidence on medical expenses suggests that all of the jury's determinations were made without regard for the evidence, necessitating a new trial.

[¶ 14] Because the trial court is in the best position to assess the jury's reactions and motivations, we review its decision to deny a motion for a mistrial or a new trial deferentially. *See Gilmore v. Cent. Me. Power Co.*, 665 A.2d 666, 669 (Me.1995); *Marston v. Newavom*, 629 A.2d 587, 593 (Me.1993). We review a court's denial of a motion for a mistrial for an abuse of discretion and its denial of a motion for a new trial for a "clear and manifest abuse of discretion." *Budzko v. One City Ctr. Assocs.*, 2001 ME 37, ¶ 17, 767 A.2d 310, 315 (quotation marks omitted). On the record before us, we discern no abuse of discretion in the trial court's denial of either motion.

A.  Denial of the Motion for a Mistrial

[¶ 15] It is impermissible for a party to "encourage[ ] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988) (quotation marks omitted). The use of such arguments, commonly called Golden Rule arguments, is "universally condemned" because it threatens the essence of a fair trial. *Id.*

[¶ 16] Despite the impropriety of this type of argument, a mistrial is required only when, in light of the circumstances of the particular case, a curative instruction could not dissipate the ill effects of the prejudicial statement. *See id.* at 309–10; *Budzko*, 2001 ME 37, ¶ 18, 767

A.2d at 316. To determine whether a mistrial is necessary, a court may consider "the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." *Forrestal*, 848 F.2d at 309 (quotation marks omitted). After considering these criteria, if it appears that the proceeding has been so tainted by appeals to prejudice that no means short of a new trial would serve the interests of justice, a mistrial should be ordered. *See State v. Bridges*, 2004 ME 102, ¶ 11, 854 A.2d 855, 858. Absent such exceptionally prejudicial circumstances, we will not interfere with a trial court's decision to give a curative instruction, rather than grant a motion for a mistrial, following a Golden Rule argument. *See Colvin v. A R Cable Servs.-ME, Inc.*, 1997 ME 163, ¶ 10, 697 A.2d 1289, 1291.

[¶ 17] During their closing argument, the Petersons remarked, "No one would want to switch places right now more than Donna Peterson." The court acted promptly to minimize any potential damage from the Petersons' reference to "switch[ing] places" by sustaining Mid Coast's objection and giving a curative instruction. The Petersons immediately abandoned this line of argument, and the court later informed the jury of the accepted means of measuring damages, specifically disallowing calculations based on prejudice or sympathy. In these circumstances, the trial court's response effectively cured any potential prejudice resulting from one isolated comment. Accordingly, the court did not abuse its discretion by denying Mid Coast's motion for a mistrial.

B.  Denial of the Motion for a New Trial

[¶ 18] Assessing damages is the responsibility of the jury and generally

its judgment must stand. *Wood v. Bell,* 2006 ME 98, ¶ 24, 902 A.2d 843, 851; *Michaud v. Steckino,* 390 A.2d 524, 536–37 (Me.1978). However, the trial court may intervene to set aside an excessive verdict if the moving party is able to demonstrate that "the jury acted under some bias, prejudice or improper influence, or [has] made some mistake of fact or law." *Provencher v. Faucher,* 2006 ME 59, ¶ 6, 898 A.2d 404, 406–07 (quotation marks omitted); *Pelletier v. Fort Kent Golf Club,* 662 A.2d 220, 224 (Me.1995) (quotation marks omitted). It is not for the court to interfere "merely because the [verdict] is large, or because the court would have awarded less." *Marquis v. Farm Family Mut. Ins. Co.,* 628 A.2d 644, 650 (Me.1993) (quotation marks omitted).

[¶ 19] To determine whether a verdict is excessive, the trial court examines the evidence in the light most favorable to the verdict. *Chenell v. Westbrook Coll.,* 324 A.2d 735, 737 (Me.1974). If the verdict bears no rational relationship to the evidence, then the trial court must also evaluate the jury's motivation for awarding excessive damages. *See Nyzio v. Vaillancourt,* 382 A.2d 856, 861–62 (Me.1978); 2 Field, McKusick & Wroth, *Maine Civil Practice* § 59.2 at 61–62 (2d ed.1970). Where the trial court determines that an excessive damages award results from an improper motive, such as passion or prejudice, a new trial is the appropriate remedy. *Nyzio,* 382 A.2d at 861. But where an excessive verdict results from a good faith mistake, for example, a new trial is unnecessary and the court may order a remittitur to the "maximum permissible" amount that rationally could be found by a jury. *Id.* at 861–62; *see also* M.R. Civ. P. 59(a).[2]

In light of the trial court's observations at trial, it is in a far better position than an appellate court to determine whether the damages are rationally supported by the evidence and whether the jury had an improper motive for awarding excessive damages. *See Marston,* 629 A.2d at 593.

[¶ 20] In the instant case, the trial court determined that only one component of the jury's damages award was excessive and that the verdict was not based on an improper motive. On this record, the trial court did not commit a clear and manifest abuse of discretion in reaching these determinations.

[¶ 21] The jury awarded past medical costs of $160,000 despite having evidence of only one radiation bill in the amount of $12,257.50. However, the court had instructed the jury to consider the "reasonable value for the care and treatment of [Donna's injuries]," without telling them that there had to be medical bills in evidence in order to award damages for medical expenses. In light of the testimony referencing Donna's massage therapy, chiropractic appointments, trips to the emergency room, physical therapy, x-rays, and diagnostic tests, the remainder of the jury's award may reflect an attempt to value these expenses although the Petersons had not presented bills for these services. Thus, the trial court could reasonably determine that the jury mistakenly used an improper measure of damages, and was not influenced by an improper motive, in awarding damages for medical costs.

[¶ 22] Nor did the trial court commit a clear and manifest abuse of discretion in determining that the damages

**2.** Maine Rule of Civil Procedure 59(a) provides, in relevant part, "A new trial shall not be granted solely on the ground that the damages are excessive until the prevailing party has first been given an opportunity to remit such portion thereof as the court judges to be excessive."

awarded by the jury for pain and suffering and for loss of consortium were within the range permitted by the evidence. *See Withers v. Hackett,* 1999 ME 117, ¶¶ 7–8, 734 A.2d 189, 190–91 (noting that juries are entitled to considerable deference in translating intangible, non-economic losses into money damages). The Petersons' testimony regarding the marked deterioration of their quality of life, Donna's persistent pain over several years, her frustration with her inability to obtain relief, Joseph's assumption of the household tasks, and the negative consequences of radiation provides a rational basis for the jury's award of $700,000 for pain and suffering and $300,000 for loss of consortium.

The entry is:

Judgment affirmed.