STATE OF MAINE                                      SUPERIOR COURT
YORK, ss.                                           Civil Action
                                                    Docket No. RE-16-0131

DIANE BOUCHER, Personal          )
Representative of the Estate of  )
David A. Boucher,                )
                                 )
            Plaintiff,           )
                                 )        ORDER ON DEFENDANT'S MOTION
      v.                         )        TO ALTER OR AMEND JUDGMENT
                                 )
                                 )
MARY NASON,                      )
                                 )
            Defendant.           )

Defendant Mary Nason has moved under M.R. Civ. P. 59(e) to alter or amend a jury verdict awarding compensatory damages to plaintiff in the amount of $32,000. Specifically, she seeks remittitur of that amount to $31,288.75. For the reasons that follow, the motion is granted in part.

It is the jury's responsibility to assess damages. Absent bias, prejudice, improper influence, or mistake, a jury's verdict "must stand." *Seabury-Peterson v. Jhamb*, 2011 ME 35, ¶ 18, 15 A.3d 746; *Wood v. Bell*, 2006 ME 98, ¶ 24, 902 A.2d 843. This is not a case in which the verdict was tainted by bias, prejudice, improper influence, or improper motive.

The issue raised by defendant's motion is whether the jury made a good faith mistake in tallying the compensatory damages to which plaintiff is entitled. A Rule 59(e) motion based on mistake does not present an opportunity for a new trial if the damage award may be remitted to the "'maximum permissible' amount that rationally could be found by a jury." *See Nyzio v. Vallaincourt*, 382 A.2d 856, 861-62 (Me. 1978). In evaluating whether a jury's award of damages is excessive, the court is required to

1

examine the evidence at trial in the light most favorable to the verdict. *Seabury-Peterson*, 2011 ME 35, ¶ 19, 15 A.3d 736.

It is evident that the jury struggled to quantify the amount of compensatory damages in this case. A little over an hour after deliberations commenced, the jury foreperson sent out a note asking, "What is the amount of compensatory damages to be awarded to the plaintiff?" (Tr. Day 2 at 324:22-23.) The court met with counsel in chambers to review the note and determine an appropriate response. Plaintiff's counsel stated that he had addressed the proper measure of damages in his opening statement.[1] (Tr. Day 2, at 325:6-7.) With agreement of both counsel, the court re-instructed the jury on compensatory damages as follows: "I have instructed you on the law with respect to damages. And as to what is the amount of compensatory damages to be awarded, that is for you to determine on the basis of the evidence that's been presented to you." (Tr. Day 2, at 331:25 - 332:4.)[2]

---

[1] Plaintiff's counsel previewed the amount of compensatory damages claimed on behalf of his client in his opening statement as follows:

> "The purpose of compensatory damages will be to compensate David for the difference between a one-third share, and a one-half share of the Biddeford real estate. The net proceeds from the 54 State Street property was a little more than $180,000. Half of this amount is a little more than $90,000. David received a third, or a little more than $60,000. So a proper award of compensatory damages will be a little more than $30,000."

(Tr. Day 1 at 50:22 - 51:5.) This is consistent with the claim set forth in the complaint on the breach of fiduciary duty count, namely "compensatory damages equal to [one-sixth of the value of the property]." (Pl. Compl. ¶ 58.) Plaintiff's counsel did not specify any other measure of compensatory damages in his opening statement. In his closing statement, plaintiff's counsel did not request a specific amount of compensatory damages but did highlight the $650 bill for legal services that is discussed below. (Tr. Day 2 at 268:5-12.)

[2] The full instructions regarding compensatory damages given at the close of trial were as follows:

> "Any damages that you award must be based on the evidence and on a finding that the plaintiff has convinced you that it is more likely than not that the plaintiff has been damaged as claimed. Damages may not be awarded on the basis of guesswork or speculation, nor on the basis of passion, prejudice, or sympathy. If you find that plaintiff is entitled to recover damages, you must award an amount

2

The fundamental measure of compensatory damages in this case was, as defendant contends and as suggested by plaintiff's counsel in his opening statement, the difference between a one-third share and a one-half share of the value of Irene Boucher's real estate devised to her son, David, under her will. Because the real estate had been sold (by agreement of the parties) during the pendency of this case, the actual value of plaintiff's claim was reduced to a sum certain, namely the $31,288.75 held in escrow pending the outcome of the litigation. The total amount of the net proceeds from the sale of the property was in evidence; and the amount of a one-third share of the net proceeds from the sale was in evidence.[3] The jury, therefore, could have (and should have) determined the precise difference between a one-third share and a one-half share of the net proceeds as the measure of damages. Their task, however, was made considerably more difficult by counsel's failure to offer any other admissible evidence of this amount beyond the oral testimony of his client.

The court rejects plaintiff's contention that a rational jury would have been justified in using a higher value based upon evidence of the estimated fair market value of the real estate in 2014. This informal estimate of value was made three years before the actual sale of the real estate. Once put on the market and sold in 2017, the property's actual fair market value was determined.

Plaintiff cites two additional reasons to justify a damage award in an amount greater than $31,288.75: (1) David Boucher's "overpayment" of household living

---

of damages that will [justly] and fairly compensate for the losses resulting from the injuries sustained."

(Tr. Day 2, at 309:10–18.)

[3] Diane Boucher testified that the 54 State Street property sold on November 1, 2017 and generated net proceeds of $187,732.53, and one-third of that amount was $62,577.71. (Tr. Day 1 at 216:25 - 217:24.)

3

expenses to Mary Nason in the years 2011 to 2015; and/or (2) David's reimbursement of attorney's fees without sufficient explanation or information as to what services the bill covered.

Plaintiff's Exhibit 6 at trial was a spreadsheet documenting expenses associated with the 54 State Street property from 2011 to 2015. David and Diane Boucher lived upstairs at the property and split the expenses 50/50 with defendant Mary Nason, who lived downstairs. The spreadsheets show that David paid Mary $16,144.45 for his one-half share of the expenses during this time. Plaintiff claims that David overpaid because, in fact, he was only a one-third owner and not a one-half owner of the property; the difference between one-half and one-third of the expenses was $ 2,690.74 ; and that he properly should be reimbursed for that difference. This argument is unpersuasive for several reasons.

Putting aside reimbursement of legal fees which is discussed below, the expenses reflected on Exhibit 6 were the costs incurred in maintaining and using the house which the parties shared. David and Diane paid 50% because they occupied 50% of the house. And, the jury effectively determined that in retrospect David's interest in the real estate would have been 50%. Thus, a rational jury would not have recognized his payment of one-half of the expenses as an overpayment. In light of the jury's verdict, David and Diane had paid their fair share. Moreover, these expenses occurred after the closure of the estate and, at best, have a remote connection to the breach of fiduciary duty claim at issue.[4]

---

[4] Even if these damages were recoverable in this breach of fiduciary action, they appear to be more in the nature of special damages. *See Thoms v. Dingley*, 70 Me. 100, 102 (1879); 2 Harvey & Merritt, *Maine Civil Practice* § 9.6 (3d ed. 2011); *see also* Horton McGehee, *Maine Civil Remedies* § 4-3(a) (2d 1996) (While there is "no hard and fast means of differentiating between general and special damages, . . . one criterion is whether the damages in question could virtually always be expected to occur as a result of the wrong complained of.") Plaintiff had knowledge of these expenses from the outset of the case but did not identify them specifically as compensatory

4

As to plaintiff's final ground for justifying the jury's award—unfair reimbursement of attorney's fees—the evidence established that Mary had requested David pay 50% of a legal bill from Attorney Jamieson totaling $650 and that David had paid the $325 as requested. Attorney Jamieson's bill reflected the following services but was not itemized as to the specific value of each: "Conference with client; Draft and Finalize Deed of Distribution; Deed to Son; Living Will; Durable Power of Attorney; and Last Will and Testament." (Pl. Ex. 9.) *See also* Tr. Day 2 at 60:25 - 61:1. Mary offered testimony about the bill and whether she had provided a copy to David; the jury was free to believe or not believe her testimony. *Id.* at 59:15 – 64:17. Unlike the 2011-15 household expenses, this expense directly related (in part) to Mary's fiduciary duties a personal representative of their mother's estate.[5] The two deeds referenced in the bill were the deeds in issue in this case relating to final disposition of Irene Boucher's real estate. The remaining items in the bill, however, were personal to Mary.

The jury found that Mary had breached her fiduciary duty to David. It therefore could properly have considered David's partial reimbursement of the attorney's fee bill as an element of damages. 18-A M.R.S. § 3-712 (personal representative "liable . . . for damages or loss resulting from breach of [her] fiduciary duty to the same extent as a trustee of an express trust); *Estate of Wilde*, 1998 ME 55, ¶¶ 8-9, 708 A.2d 273; *see also*

---

damages. Special damages need to be specifically pleaded. M.R. Civ. P. 9(g); Horton & McGehee, *Maine Civil Remedies* § 4-3(a) ("Special damages must be pleaded specifically and must be particularized with sufficient certainty to notify the defendant of the item of damage for which compensation is sought.") (citing M.R. Civ. P. 9(g); 22 Am. Jur. 2d *Damages* § 272 (1965)). And, remittitur of special damages is authorized when not specifically pleaded. *See Coral Gables v. Neill*, 182 So. 432, 433 (Fla. S. Ct. 1938) (per curiam); *Dibert v. Ross Pattern & Foundry Development Co.*, 152 N.E.2d 369, 376 (Ohio Ct. App. 1957).

[5] And, even though the $650 legal fees expense was known to plaintiff from the outset of the case, the services covered by the bill were not known until late in the case when Attorney Jamieson found and turned over a copy of the bill from his records. Thus, plaintiff would not have known to include this expense as an element of compensatory damages at the outset of the case.

Restatement (Third) of Trusts, § 100(b), cmt. e (2011) (aggrieved party may recover damages measured by "any benefit to the trustee personally as a result of the breach").

A rational jury, therefore, could have determined that Mary breached her fiduciary duty by not fully disclosing to David the nature of the services covered by the Jamieson bill and requiring him to pay half. Because the bill was not itemized, it would not have been unreasonable for the jury to award damages in the full amount David had paid—$325.00. In that event, the total award should have been $31,615.75 ($325 + $31,288.75). Instead, the jury awarded $32,000, which potentially represented either (i) a mistaken reliance on the total amount of the attorney's fee bill of $650 as an appropriate measure of damage with some additional rounding up ($650 + $31,288.75 = $31,938.75 rounded up to $32,000 ); or (ii) simply an approximation of the difference between a one-third share and one-half share of the value of the real estate made out of convenience, without close attention to the record evidence and a request for a read-back. Either way, the sum of $32,000 itself is not supported by the evidence. Viewing the evidence in the light most favorable to the verdict, the "maximum permissible amount" a rational jury could award based on the record evidence at trial is $31,615.75.

Thus, defendant's motion is granted in part and the entry shall be:

"Defendant's Motion to Alter or Amend Judgment for Remittitur of Award of Compensatory Damages granted in part. Judgment amended to reflect award of damages to plaintiff in the amount of $31,615.75."

The clerk may enter this Order on the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: October 24, 2018

Wayne R. Douglas
Justice, Superior Court

STATE OF MAINE                                    SUPERIOR COURT
YORK, ss.                                         Civil Action
                                                  Docket No. RE-16-0131


DAVID A. BOUCHER,

                        Plaintiff,

                                                  **MEMORANDUM OF DECISION**
        v.                                        **AND ORDER ON MOTION FOR**
                                                  **SUMMARY JUDGMENT**
MARY K. NASON and
JAMES C. NASON,

                        Defendants.

Defendants Mary Nason and James Nason have moved for summary judgment.

For the reasons set out below, the motion is granted in part and denied in part.

### I. Summary Judgment Factual Record[1]

David Boucher and Mary Nason are siblings. Their mother, Irene Boucher, owned

and resided in a duplex located at 54 State Street in Biddeford, Maine (the "Property")

before she passed away on January 19, 2009. (D.S.M.F. ¶ 1.) In her will, Irene devised

the Property to David and Mary in equal shares; and if either Mary or David had

predeceased Irene, Mary's son, James Nason, would receive a one-quarter interest in

the property under the will. (D.S.M.F. ¶ 2-3.) Mary was designated as personal

representative of Irene's estate. (D.S.M.F. ¶ 2.)

According to Mary, before Irene died she told Mary that she wanted James to be

added to the deed of the Property. (D.S.M.F. ¶ 5.) The will, however, was not amended.

Irene passed away four days later. [2] (D.S.M.F. ¶ 6.)

---

[1] Defendants object to various portions of plaintiff's responses and supporting record materials.
See section III(A), *infra*.

[2] Plaintiff contends that this conversation is "not admissible, plausible or credible." (Pl.'s Opp.
3.) The parole evidence rule excludes extrinsic evidence of a testator's intent in relation to
unambiguous terms of a will. *See Maietta v. Winsor*, 1998 ME 84, ¶ 7, 710 A.2d 238 (statements
of attorney who drafted will inadmissible to prove testator's intent). The conversation between

1

The estate was opened in York County Probate Court and Mary was formally appointed as personal representative of the estate. (D.S.M.F. ¶ 8.) Because Mary was going through divorce and David was in bankruptcy at the time, they agreed that all of the assets of the estate would be distributed except the Property, which would be deferred until a later time. (D.S.M.F. ¶ 10.) In early 2011, with their respective, individual issues resolved, the Property was distributed. (D.S.M.F. ¶ 12.)

Mary states that she told David about their mother's desire to add James to the Property's deed; and David agreed. (D.S.M.F. ¶¶ 18-19.) David disputes this. He contends that Mary never discussed adding James to the deed with him and he never agreed to James's addition. (P.A.S.M.F. ¶ 60.)

Mary consulted with her divorce attorney, Neil Jamieson, about how to proceed in order to add James to the deed. (D.S.M.F. ¶ 21.) Attorney Jamieson told her that two deeds must be drafted in order to effectuate the transfer: (1) a deed of distribution conveying the Property from Mary as personal representative of Irene's estate to Mary and David; and (2) a quitclaim deed from Mary and David to Mary, David, and James as joint tenants. (D.S.M.F. ¶ 22.) Mary confirmed with Attorney Jamieson that David could call him with questions concerning the transfer. (D.S.M.F. ¶ 23.)

Attorney Jamieson prepared the deeds and contacted Mary, informing her that she and David needed to come to his office to sign the paperwork. (D.S.M.F. ¶ 24.) Mary claims she then told David that he needed to go to Jamieson's office to sign some papers that would complete the transfer and that after it was finished, he would receive a copy of the deeds. (D.S.M.F. ¶¶ 25; 53.) David says that Mary told him that he need to go to Attorney Jamieson's office to "finalize everything," which he understood to mean the

---

Irene and Mary in issue here may not be inadmissible if offered for other purposes. *Cf. Burdzel v. Sorbus*, 2000 ME 84, ¶ 11, n. 6, 750 A.2d 573 (statements admissible on the issue of malfeasance even if inadmissible to prove testator's intent in will).

2

transfer of the Property according to the terms of the will. (P.O.S.M.F. ¶¶ 26, 50-51; Boucher Dep. 21.) During their conversations, Mary did not make any specific representations to David about the contents of Irene's will or the quitclaim deed. (D.S.M.F. ¶¶ 27-28; 32.)

James Nason was living out of state and was not involved in the process of probating Irene's estate or the signing of the deeds in 2011. (D.S.M.F. ¶ 14.) James never spoke to David about Irene's will or the deeds. (D.S.M.F. ¶¶ 15-17.) He did not know about the deeds until Mary sent him a copy after they had been signed. (D.S.M.F. ¶ 14.)

Mary and David went to Jamieson's office separately on different days. (D.S.M.F. ¶ 33.) Mary signed the deed of distribution and the quitclaim deed on April 18, 2011; David signed the quitclaim deed two days later, on April 20, 2011. (D.S.M.F. ¶¶ 34-35.) Both executed the deed before Attorney Jamieson and his staff, including a notary. (D.S.M.F. ¶ 33.)

When David went in on April 20th to sign the papers, Attorney Jamieson placed the deed in front of him, saying that it was what their mother wanted. (D.S.M.F. ¶ 36.) David signed the document. (D.S.M.F. ¶ 36.) Consistent with his policy and practice, Attorney Jamieson inquired whether David was signing the instrument of his own free will and volition, free of duress as his free act and deed; and David confirmed that he was. (D.S.M.F. ¶ 45.) After he had signed the deed and while his signature was being notarized, David saw James's name on the deed. (P.O.S.M.F. ¶¶ 29-30, 40, 56.) The deed was notarized by a staff member in Jamieson's office, Tamika Yee. (D.S.M.F. ¶ 37.) The deed was recorded on April 25, 2011 in the York County Registry of Deeds at Book 16085, pages 651-652. (D.S.M.F. ¶ 58.)

3

David claims he did not actually learn about James's interest in the Property until July of 2015, four years later. (P.A.S.M.F. ¶ 89.) He further claims that subsequent to signing the deed he asked Mary why James's name appeared on the deed and was told that James would only receive her share upon her death. (P.O.S.M.F. ¶ 29, Pl. Dep. 31:19-22.) Mary offered to provide David with a copy of the deed, but he declined. (D.S.M.F. ¶¶ 54, 56.) David testified at deposition that he felt rushed by Attorney Jamieson during the process, partly because he arrived at Jamieson's office five minutes before it closed. (D.S.M.F. ¶ 47; Boucher Dep. 23.)

In October of 2016, David filed the instant complaint, alleging fraud (count I) and breach of fiduciary duty (count II); and seeking imposition of a constructive trust (count III) and equitable partition of the Property (count IV). Following the close of discovery, defendants filed the instant motion for summary judgment, arguing that plaintiff had not sufficiently shown the elements of fraud and breach of fiduciary duty and that equitable partition is moot because the Property has already been sold.

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821. When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

In order to withstand a motion for summary judgment, a plaintiff must set forth a *prima facie* case of each element of the cause of action. *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346. *See also Richards v. Town of Eliot*, 2001 ME 136, ¶ 11, 780 A.2d

4

281, 287; *Smith v. Cannell,* 1999 ME 19, ¶ 6, 723 A.2d 876, 878-79 (summary judgment warranted against party with burden of proof at trial where evidence insufficient on an essential element and opposing party entitled to judgment as a matter of law.) With regard to a fraud claim in particular, "plaintiffs must demonstrate specific facts that create a dispute as to whether defendants made a misrepresentation of material fact, with knowledge of its falsity or in reckless disregard of whether it was true or false and as to whether they reasonably relied on the misrepresentations to their detriment." *Barnes v. Zappia,* 658 A.2d 1086, 1089 (Me. 1995). Because an elevated clear and convincing evidence standard applies, a plaintiff must adduce sufficient evidence to allow a finding that it was "highly probable," not merely likely, that the fraud occurred. *Id., citing Taylor v. Commissioner,* 481 A.2d 139, 153 (Me. 1984).

## III. Discussion

### A. Challenges to Plaintiff's Supporting Materials

Defendants object to some of plaintiff's statements of material facts, portions of his affidavit, and other materials as unsupported by proper record citations; resting on conclusory, speculative or other improper assertions; or as being in conflict with plaintiff's prior sworn testimony. *See* Defendants' Objections to Plaintiffs' Responses to Defendant's Statement of Material Facts and Reply to Plaintiff's Additional Statement of Material Facts. The court addresses objections that are material to the disposition of the instant motion.

#### 1. Plaintiff's Affidavit and Statement of Material Facts

Defendants challenge some of plaintiff's statements of material facts that rely on portions of his supporting affidavit because they conflict with his prior sworn testimony. In particular, they challenge a number of responses (including, for example, responses to paragraphs 26, 28, 29, 30, 31), all of which go to elements of the fraud claim, namely

5

false representation and reasonable reliance. The relevant portions of the affidavit at issue are paragraphs 14 to 18.[3]

A party "will not be permitted to create an issue of material fact in order to defeat a summary judgment motion simply by submitting an affidavit disputing his own prior sworn testimony;" and "cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory but does not give a satisfactory explanation of why the testimony is changed." *Zip Lube v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733 *citing Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

As to the issue of misrepresentation, Plaintiff's deposition testimony is not fully consistent with his denial of Defendants' Statement of Material Fact #26, which asserted that David "was not relying on any representations from Mary because she never made any representations to him about what was in the deed or what was not in the deed." (D.S.M.F. ¶ 26.) Plaintiff explains his denial: "David relied on Mary's *false representation* that he needed to sign papers including a deed at Neil Jamieson's office *to implement the 50/50 division of real estate pursuant to my mother's will.*" (P.O.S.M.F. ¶ 26)

---

[3] 14. In April 2011, Mary told me that I needed to go to Neil Jamieson's office to sign papers including a deed to finalize the probate process to have the real estate transferred to her and me as contemplated in our mother's will. . . .

15. Mary never told me that I would be signing anything to change the [sic] fact she and I were to each receive half of the Biddeford real estate as stated in our mother's will.

16. At no time did I think I was signing anything that would change this 50/50 division of the real estate between my sister and me.

17. I did not know at the time that there was no need for me to sign anything to transfer the real estate to my sister and me in accordance with our mother's will. . . .

18. I relied on my sister's false statements to me that I needed to go to Neil Jamieson's office to sign papers including a deed to transfer the real estate to her and me in accordance with our mother's will.

(Boucher Aff. ¶¶ 14-18.)

6

(Emphasis added.) Cited in support of the denial is paragraph 18 of his affidavit, which is referenced in footnote 3, above.

At his deposition, plaintiff testified numerous times essentially that Mary "told me I had to go down and sign that [the deed] . . . so everything would be finalized;" that "[s]he did not tell me what the deed was for" and "there was no other discussion" about it; and that it was his understanding he was to receive a 50% interest in the Property. (Boucher Dep. 21:9-23, 22:4-12, 44:24 – 45:19, 46:19 – 47:2.) Plaintiff also testified (without further elaboration) that he was "*led to believe* that it was a deed my mother made out leaving us 50/50. [Mary] said you have to go sign that so we can get a copy and it will be finalized." (Boucher Dep. 42:19-21.) (Emphasis added). In addition, in response to questions from his attorney on cross-examination, plaintiff testified as follows:

> "Q: And when Mary said you had to go to Neil Jamieson's office, it was for what purpose?
> A: It was to finalize the will into the deed.
>
> Q: To make it official so that –
> A: Correct, that's what I was told
>
> Q: --you would each own 50/50?
> A: Uh-huh."

(Boucher Dep. 51:17-23.) (Emphasis added.)

Plaintiff's deposition testimony does not establish that Mary made any representation at all to David about the actual content or substance of the quitclaim deed. The "led to believe" testimony quoted above does not expressly tie back to an actual representation Mary made. The closest David's testimony comes to linking Mary's direction for him to go sign the deed to "finalize the will" with the result of an equal distribution was in the question-and-answers just quoted; but this is very tenuous. The testimony was general in nature; was partially responsive to a leading

7

question from counsel; and stands in direct conflict with the rest of David's testimony that repeatedly stated otherwise. Therefore, the court rejects plaintiff's denial to D.S.M.F. 26 in part and deems admitted for purposes of the summary judgment record that Mary did not make "any representations to him about what was in the deed or what was not in the deed." (D.S.M.F. ¶ 26.)

Defendants further contend that portions of plaintiff's affidavit regarding his belief that he needed to sign the deed in order to effectuate the will's mandate that he and his sister receive 50% of the Property also conflicts with his deposition testimony where he stated he knew he didn't have to sign the document. Plaintiff testified at deposition that he was not forced to sign the will, but stated, "I didn't have any reason not to sign it because I trusted my sister. She told me I needed that to finalize mom's will and do the deed." (Boucher Dep. 48.) In light of his testimony, the affidavit statements are not necessarily inconsistent.

Plaintiff's deposition testimony also does not appear to contradict his affidavit's contention that he only saw that James was on the deed after he had signed it. In his deposition, plaintiff stated:

> Q: When did you notice that [James's name was on the deed]?
> A: When Tamika or whoever it was who signed it was taking it away, so I asked Mary, I said, how come James' name is on there. She said, if anything ever happens to me James will get my portion.

(Boucher Dep. 31:18-22.) Defendants note that plaintiff admitted that he noticed James's name on the deed "at the time that he executed the deed." (D.S.M.F. ¶ 40.) This, too, is not necessarily inconsistent or contradictory.

### 2. Other Materials

Defendants challenge the affidavits of Linda and Marvin Stritch submitted in opposition to their motion for summary judgment. In their affidavits, Linda and Marvin Stritch recount that in 2015 they were asked by David's wife, Diane, to review and

8

interpret the quitclaim deed; that they located an attorney to confirm their understanding of the deed; and David and Diane were surprised that David only inherited a one-third interest in the Property under the deed. The affidavits have little relevance to the fraud claim, which involves representations and actions that occurred four years prior and pertain to the deed David concedes he did not read. Although the Stritch affidavits may have some arguable relevance to the breach of fiduciary duty claim, they are cumulative at best and the court does not rely on them for purposes of the instant motion.

Defendants also object to an affidavit submitted by plaintiff's counsel. Attorney McCullough's affidavit purports to introduce a number of email exchanges between counsel, other documents, and a 15-paragraph, unsigned affidavit of Attorney Jamieson which includes a number of statements and actions imputed to him by Attorney McCullough that relate to representation of Mary and discovery issues in this case. The McCullough affidavit is inadmissible and is disregarded for purposes of this summary judgment motion.

## B. Fraud Claim Against Mary

Fraud requires proof by clear and convincing evidence of (1) false representation, (2) of a material fact, (3) made with knowledge of its falsity or in reckless disregard of whether it was true or false, (4) for the purpose of inducing a person to act in reliance, and (5) reasonable or justifiable reliance thereon to one's detriment. *Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280. As noted, in the context of a summary judgment motion, plaintiff must "produce evidence that demonstrates the existence of each element of fraud is 'highly probable' rather than merely likely." *Barnes*, 658 A.2d at 1089. Evidence that merely "permit[s] an inference that the requisite elements are present . .

9

. is not enough to satisfy the 'highly probable' standard on summary judgment on a claim of fraud." *Id.* *See also Taylor v. Commissioner,* 481 A.2d 139, 153 (Me. 1984).

### 1. False Representation

When viewed in the light most favorable to plaintiff, the record facts do not establish it "highly probable" that Mary made any representations about the content or substance of the quitclaim deed itself. It is plaintiff's contention, however, that Mary's direction to David to sign the deed in order to "finalize everything," in and of itself, constituted a false representation because there was no need for David to sign any document in order to effectuate distribution of the Property in accordance with the will. Mary, however, did not make that statement. Based on the instant record, it is not "highly probable" that David's erroneous belief about the quitclaim deed's content and effect came from any affirmative representation made by Mary but rather from his prior understanding of what the will provided. In fact, it was not what Mary said that induced this belief. If anything, it was more likely what she did *not* say that contributed to his misunderstanding, if he had a misunderstanding.

In that regard, plaintiff advances two alternate grounds upon which to satisfy the element of false representation. He contends for the first time in his opposition to the summary judgment motion that Mary's failure to inform him that James was being added to the deed constituted a misrepresentation by omission. Failure to disclose facts may be actionable as fraud only in limited circumstances, including where a "special relationship" exists. *Brawn v. Oral Surgery Assocs.,* 2003 ME 11, ¶ 22, 819 A.2d 1014, *citing Glynn v. Atlantic Seaboard Co.,* 1999 ME 53, ¶ 12, 728 A.2d 117. Mary, as personal representative of Irene's estate, stood in a special relationship with, and had fiduciary duties to, David as a beneficiary of the will. The court addresses this in section III(C), below.

10

Defendants correctly contend, however, that plaintiff did not plead fraud by omission. The complaint only references "intentional misrepresentations." (Def.'s Repl. 4; Compl. ¶¶ 37-39.) Matters not pleaded in the complaint are not properly raised for the first time in a motion for summary judgment. *Heller v. Coyne*, No. RE-10-278, 2011 Me. Super. LEXIS 71, *1 (April 6, 2011). This principle is especially applicable here because of the requirement that one must plead fraud with particularity in the complaint. M.R. Civ. P. 9(b). Consequently, plaintiff cannot at this point assert this ground as a basis for proving an element of his fraud claim, particularly where the complaint also pleads as a separate claim a breach of fiduciary duty.

Finally, plaintiff argues that Attorney Jamieson made misrepresentations that should be imputed to Mary because he was acting as her agent at the time of the deed signing. Specifically, plaintiff contends that Attorney Jamieson at the deed signing made a statement to the effect: "This is what your mother wanted." Plaintiff contends that statement was false or misleading because the quitclaim deed did not reflect the terms of his mother's will.

A principal may be liable for fraudulent acts of an agent acting within the scope of the agent's authority when the principal adopts the contract or action that was induced by fraud "whether or not the principal knows or is unaware of his agent's misconduct." *Crowley v. Dubuc*, 430 A.2d 549, 552 (Me. 1981). *See also Rhoda v. Annis*, 75 Me. 17, 25 (1883). An agency relationship arises "from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act." *Perry v. H.O. Perry & Son Co.*, 1998 ME 131, ¶ 7, 711 A.2d 1303.

On the basis of the summary judgment record it may not be "highly probable" that Attorney Jamieson's ambiguous statement constituted a false representation—but

11

it is a closer call that depends upon consideration of conflicting material facts. However, the court need not decide this issue because on the instant record, plaintiff has not sufficiently established the justifiable or reasonable reliance element of the fraud claim.

## 2. Reasonable Reliance

A plaintiff is not justified in relying on a fraudulent misrepresentation "if he knows it is false or its falsity is obvious to him." *Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979), *quoting* Restatement (Second) of Torts § 541(1977). Parties to contracts and other transactions "are deemed to have read the contract and are bound by its terms." *Francis v. Stinson*, 2000 ME 173, ¶ 42, 760 A.2d 209, *citing Ocor Prod. Corp. v. Walt Disney Prod. Inc.*, 682 F. Supp. 90, 93 (D. N.H. 1988). Even when a party is presented with a written manifestation of an agreement, reliance on prior representations, even if fraudulent, may be unreasonable. *Id., citing Letellier*, 400 A.2d at 376.

Even if Mary's representations—whether made personally or by an agent—are considered false or misleading, the court cannot conclude that the record facts establish it "highly probable" that plaintiff has satisfied the reasonable reliance element of his fraud claim; and therefore summary judgment is warranted. *See Francis v. Stinson*, 2000 ME 173, ¶ 42, 760 A.2d 209. *Francis* involved an action for fraud brought by certain family members against other family members who allegedly misrepresented the financial condition of the family business in order to induce sale of their stock. *Id.* ¶ 42. Even though defendants had in fact misrepresented the company's financial condition, and this induced plaintiff to sign a stock purchase agreement, she had signed "[w]ith little discussion" and without reading the terms agreement and disclosures made therein that expressly detailed clearly the company's finances it. *Id.* ¶ 15. The Law

12

Court held that in the circumstances, "any reliance on those [prior] representations is not reasonable." *Id.* ¶ 42.[4]

David signed the quitclaim deed without reading it. It was not a lengthy or complex document. The deed is essentially a one-page, four-paragraph document. The full extent of the language in issue is contained in the single-sentence, first paragraph, which stated:

> **"KNOW ALL MEN BY THESE PRESENTS, WE** Mary K. Nason of Biddeford, County of York and State of Maine and David A. Boucher of Biddeford, County of York and State of Maine, give, grant, bargain, and sell to Mary K. Nason, David A. Boucher and James C. Nason, as joint tenants, the real property in Biddeford . . . described as follows."

(Jamieson Dep., Exhibit 6.) The next three paragraphs on the one-page deed describe the property. The single-sentence first paragraph above expressly mentions James; and explicitly states that Mary and David were conveying their interest to James as a "joint tenant." Even though David acknowledges that he saw James's name on the deed as it was being notarized, he chose not to ask any questions. He made no effort to seek clarification. Despite his claim that he felt unduly rushed into signing, he was not compelled to sign it. Any pressure he may have felt at the time does not render his failure to read the deed reasonable, particularly given that it would have taken a matter of seconds to read the pertinent sentence at the top of the one-page document and that he had seen James's name. *See Doe v. Cultural Care, Inc.*, No. 10-11426-DJC, 2011 U.S. Dist. LEXIS 28226, at *16 (D. Mass. Mar. 17, 2011) (granting summary judgment in

---

[4] Two cases cited in opposition by plaintiff—*Ferrell v. Cox*, 617 A.2d 1003 (Me. 1992) and *Darling v. Western Thrift & Loan*, 600 F. Supp.2d 189, 198 (D. Me. 2009)– are distinguishable. In both cases, additional misrepresentations were made *after* the plaintiffs in each case had read and questioned the documents in issue (namely an easement deed in *Ferrell*, and loan/mortgage refinancing papers in *Darling*) and *before* they signed. *See Francis*, 2000 ME 173, ¶ 47; *Darling*, 600 F. Supp.2d at 198.

13

defendant's favor where "[a]lthough rushed, [plaintiff] had the opportunity to read the document, but she did not").

Therefore, even when viewed in the light most favorable to plaintiff, the record does not support that it is "highly probable" that plaintiff has established justifiable or reasonable reliance sufficient to support a fraud claim against Mary.

### 3. Fraud Claim Against James

Summary judgment is also warranted with respect to the fraud claim against James Nason. Plaintiff's only basis for the claim is that James "ratified" the fraud by accepting the deed and failing to relinquish his interest once he found out about the fraud. (Pl.'s Opp. 1, 9.) In support of his contention, plaintiff cites to the same authority concerning a principal's liability for the fraudulent representations of an agent. *Rhoda*, 75 Me. at 25; *supra* § III.a.i.2.

An agency relationship occurs when there is a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act." *Perry*, 1998 ME 131, ¶ 7, 711 A.2d 1303. Attorney Jamieson was not acting as James's agent. Plaintiff has not shown that Mary acted as an agent for James. There is no evidence that James consented to or controlled Mary's conduct.

### C. Breach of Fiduciary Duty

Plaintiff also claims that Mary, a personal representative of Irene's estate, breached her fiduciary duty by distributing to David a one-third interest in the Property contrary to the will, without his knowledge and consent and without consideration. Defendants contend the breach of fiduciary duty claim is not viable if the fraud claim fails. They also argue Mary had completed her duties as personal representative with

14

the execution of deed of distribution from the estate to Mary and David in equal shares; and the subsequent execution of the quitclaim deed constituted a different transaction.

A personal representative of an estate is a fiduciary subject to the same duty of loyalty and liability for breach as the trustee of an express trust. *Estate of Sweetland*, 2001 ME 21, ¶ 11, 770 A.2d 1017. A trustee must administer a trust in the interest of the beneficiaries. 18-B M.R.S. § 802; *Estate of Greenblatt*, 2014 ME 32, 13, 86 A.3d 1215. *See also* 18-A M.R.S. §§ 3-703 (personal representative is "a fiduciary who shall observe the standards of care applicable to trustees;" and "shall use the authority conferred . . . for the best interests of successors to the estate."). A personal representative "is under a duty to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will." 18-A M.R..S § 3-703. The duty to make full disclosure and exercise good faith "runs through the whole law of fiduciary and confidential relations [and] applies to . . . administrator and next of kin." *Estate of Whitlock*, 615 A.2d 1173, 1178 (Me. 19992) *quoting* George G. Bogert, *Trusts and Trustees*, § 544, at 407-08 (2d ed. 1978).

Whether, when, and to what extent Mary informed David of their mother's desire to include James on the deed, and thus depart from the terms of the will, are material facts in dispute that go directly to the issue of Mary's exercise of her fiduciary duty. Mary asserts that she informed David of their mother's wishes to depart from the terms of the will and he agreed. David denies this. In addition, the deed of distribution and quitclaim deeds were prepared at the same time and executed within days of one another. In these circumstances, and in the context of a summary judgment motion, the court cannot conclude as a matter of law that execution of the subsequent deed constituted a separate transaction following the discharge of Mary's duties personal representative.

15

The motion for summary judgment on count II will be denied. In light of this disposition, defendants' motion for summary judgment on the constructive claim in count III is also denied.

## D. Equitable Partition

The Property has already been sold and the proceeds are being held in escrow pending resolution of the instant suit. The claim for equitable partition of the real estate is moot and summary judgment in defendants' favor on count IV is appropriate. If plaintiff prevails at trial on count II, payment of his share of the escrowed funds would be the appropriate remedy in lieu of a partition.

## IV. Conclusion and Order

Accordingly, the court concludes that partial summary judgment is warranted, namely on the fraud claims against Mary and James Nason in count I and also with respect to the claim for equitable partition in count IV. This matter will be placed on the upcoming July/August trial list with respect to counts II and III.

Therefore, it is hereby ordered and the entry shall be: "Defendants' Motion for Summary Judgment is granted with respect to Counts I and IV and denied with respect to Counts II and III."

The clerk may incorporate this Memorandum of Decision and Order on Motion for Summary Judgment by reference on the docket pursuant to M.R. Civ. P 79(a).

SO ORDERED.

Dated: June 13, 2018

Wayne R. Douglas
Justice, Superior Court

**ENTERED ON THE DOCKET ON:** _____

16